**Marion SIMCOX, et al.,
Plaintiffs, Appellees,**

v.

**SAN JUAN SHIPYARD, INC., etc., et al., Defendants, Appellees.**

**International Shipbuilding Corporation,
Defendant, Appellant.**

**No. 84–1336.**

United States Court of Appeals,
First Circuit.

Argued Nov. 9, 1984.
Decided Feb. 7, 1985.

Harvie DuVal, North Miami, Fla., with whom Greenfield & DuVal, North Miami, Fla., was on brief for defendant, appellant.

Arnaldo Velez, Miami, Fla., with whom Taylor, Brion, Buker & Greene, Miami, Fla., was on brief for Marion Simcox and Mary Simcox.

Before BOWNES, Circuit Judge, McGOWAN,* Senior Circuit Judge, and BREYER, Circuit Judge.

* Of the District of Columbia Circuit, sitting by designation.

BOWNES, Circuit Judge.

Defendant, International Shipbuilding Corporation (International) appeals from the judgment of the district court in a jury-waived trial that International purchased stock in San Juan Shipyard, Inc., with notice that the stock had been issued and transferred in a complicated series of transactions designed to defraud plaintiffs, Marion and Mary Simcox, and that, consequently, International has no interest in such stock. International contends that the court erred because: (1) the plaintiffs had no standing to assert a fraudulent issuance; (2) the plaintiffs did not sufficiently plead fraud in their complaint to recover on that theory; (3) there was insufficient evidence to find that the issuance of 2,100 shares of San Juan Shipyard, Inc., stock was fraudulent; (4) International meets the requirements of a good faith purchaser; and (5) even if it does not, International as a transferee inherits the rights of its transferor(s) who were not shown to have acquired the stock with notice of defect. Although we diverge from the path taken by the district court in two instances, we affirm the judgment.

The issues in this case arise from a complicated series of financial transactions that occurred between 1968 and 1982 and evolved from the plaintiffs' sale of San Juan Shipyard. The sale was effectuated via a transfer of all of the company's outstanding stock in exchange for a promissory note and a security interest in the stock and company assets. The buyer defaulted on the note and the plaintiffs learned that their security had been eroded by the issuance and subsequent transfer of additional shares of stock.

To understand the rationale for our decision, it is necessary to consider the controversy in its full factual context. In 1965, the Simcoxs bought Stateside Services, Inc. (Stateside), a shipyard in Puerto Rico engaged in the hauling and repairing of small boats, barges, and vessels. On May 15, 1968, the Simcoxs bought certain assets and fixtures for the shipyard with money borrowed from the Puerto Rico Industrial Development Company (PRIDCO). As part of the financing arrangement, the Simcoxs executed a pledge agreement in which they pledged all 156 outstanding shares of Stateside stock to PRIDCO and Banco Credito y Ahorro Ponceno (BCAP) as security for payment of the loan. The pledge agreement provided, *inter alia*, that, during the pendency of the pledge, Stateside would not issue any additional stock, that no stock dividend would be declared by stockholders or the board of directors, that no cash dividend could be declared, and that no stock split could be authorized.

In November of 1972 the Simcoxs endeavored to sell the shipyard to Klein Enterprises and Kenneth Klein.[1] For accounting reasons related to the sale, the Simcoxs, with PRIDCO's permission, issued an additional 1,000 shares of $100 par value Stateside stock on November 22, 1972. The new shares were encumbered by the same agreement as the original 156 shares. The Simcoxs then executed the purchase and sale agreement with Klein Enterprises as purchaser and Kenneth Klein as comaker for the 1,156 outstanding shares of Stateside stock. The purchase and sale agreement called for sixty monthly payments of approximately $11,565 beginning January 1, 1973. Attached to the purchase and sale agreement and executed contemporaneously were: (1) a promissory note for $598,000 from Klein Enterprises and Klein as comaker to the Simcoxs; (2) a pledge and escrow agreement whereby Klein Enterprises pledged its interest in the "1,156 shares of common stock issued and outstanding of Stateside Services, Inc., consisting of all of the outstanding stock of all classes of the corporation ..." to the Simcoxs, upon satisfaction of the PRIDCO debt, to secure performance of all obligations of the purchase and sale agreement; (3) an agreement stating that Klein Enterprises accepted and guaranteed the pledge obligation between the shipyard and PRIDCO; and (4) a chattel mortgage on the

1. Kenneth Klein was sole owner of Klein Enterprises.

assets of Stateside Services, Inc., executed in favor of the Simcoxs.

On December 6, 1972, pursuant to the purchase and sale agreement, Stateside issued a stock certificate representing the total outstanding shares (1,156) to Klein Enterprises to replace the certificates the Simcoxs had owned. Subsequently, the name of Stateside Services, Inc., was changed to Stateside Shipyard, Inc., and then to San Juan Shipyard, Inc. Klein Enterprises changed its name to Maritime Enterprises (Maritime).

On May 10, 1973, the Simcoxs and Klein, both on behalf of Maritime Enterprises and himself, amended the amount due on the November 1972 contract to take into account uncollectible accounts receivable, and extended the payment schedule six months. In all other respects the agreement between the parties was unchanged.

On January 25, 1974, Maritime wrote a letter to PRIDCO requesting permission to issue additional stock in order to capitalize a loan from Kenneth Klein to San Juan Shipyard in excess of $200,000. It appears from the testimony of the plaintiffs' expert accountant witness, from the testimony of employees of the shipyard, and from financial records submitted in evidence that Klein never lent money to the shipyard. Based on the representation that a $200,000 capital contribution had been made to the shipyard, PRIDCO authorized San Juan Shipyard to issue 2,100 additional shares of stock to Klein on January 29, 1974. PRIDCO's authorization was conditioned on the new stock being subject to the same conditions as the other 1,156 shares.

On February 4, 1974, the shipyard issued stock certificate No. 7 representing 1,344 shares and stock certificate No. 8 representing 756 shares. The shares issued pursuant to certificate No. 7 brought the total number of outstanding shares issued by the shipyard to 2,500, the maximum number authorized by the corporate charter. The shares issued pursuant to certificate No. 8 constituted an overissuance of 756 shares. Both certificates, signed by Klein, erroneously stated that San Juan Shipyard, Inc., was authorized to issue up to 5,000 shares. The same day as the 2,100 new shares were issued to Klein, according to the backs of the certificates, Klein transferred the certificates to a Eugene Farrow subject to the terms and conditions of the pledge agreement of 1968 between the Simcoxs, Stateside (San Juan Shipyard), PRIDCO, and BCAP as required by PRIDCO. No mention was made of the security interest running directly to the Simcoxs.

Sixteen days later, on February 20, 1974, the Simcoxs entered into a supplemental agreement with Klein that enabled Maritime and San Juan Shipyard to enter a sale and leaseback arrangement with a finance company to refinance the shipyard. The agreement provided that the Simcoxs would: subordinate their chattel mortgage on the assets of the shipyard to the finance company; reduce Klein's debt to the Simcoxs by $100,000; and extend the payment period in exchange for a proxy vote and power of attorney, exercisable in the event of default, on all the outstanding common shares of San Juan Shipyard owned by Maritime.[2] The supplemental agreement further provided that Klein, Maritime and the San Juan Shipyard understood that in the event of default the Simcoxs would be entitled to elect a new Board of Directors, and appoint Marion Simcox custodial and operating receiver of the property and business of the shipyard on behalf of the San Juan Shipyard.[3] Klein, of course, did not tell the Simcoxs that sixteen days earlier he had sold the majority of the shipyard's outstanding stock to Farrow.

**2.** The supplemental agreement also gave the Simcoxs mortgages on several other Klein real estate interests.

**3.** Klein, Maritime Enterprises, and San Juan Shipyard also agreed that "in the event it becomes necessary, desirable, or convenient, in the judgment of Simcox to secure judicial confirmation of the status of Marion Simcox as custodial and operating receiver of the property and business of [the shipyard they would] ... join in and assist in any application for confirmation."

The money obtained from the leaseback arrangement was diverted to another business venture of Klein's and Maritime defaulted before making a single payment to the Simcoxs. On July 26, 1974, San Juan Shipyard filed a petition in bankruptcy under Chapter XI. The petition contained a sworn statement that the total issued and outstanding stock was 1,156 shares and that all of the stock was owned by Maritime Enterprises. San Juan Shipyard's attorney thereafter wrote all creditors and claimants of San Juan Shipyard and enclosed a financial statement showing that the total issued and outstanding stock of San Juan Shipyard was 1,156 shares. The Simcoxs filed a claim with the bankruptcy court in 1974. After unsuccessfully trying to collect on their promissory note, the Simcoxs obtained a proxy vote from the escrow agent and voted themselves directors. They were not, however, able to take control of the shipyard.

On August 4, 1980, Farrow executed two transfers of stock forms to Viking Investments Limited, an entity for whom Farrow would serve as a director but which had not yet been chartered at the time of the purported transfer. The transfer forms have a notary's initials and the date August 4, 1980, ascribed on the bottom of each, but the lines where the date is to be inserted by the transferor or transferee were left blank. The signature and authority of the Florida notary were not authenticated at trial.

On December 12, 1980, the Simcoxs filed this declaratory action against Klein, Maritime Enterprises and the acting president of the shipyard seeking a judicial determination that Marion Simcox was entitled to manage and control the shipyard and an injunction restraining defendants from interfering with plaintiffs' right to possession.

Sometime in early 1981 Michael Zepetis, Jr., became interested in buying San Juan Shipyard stock, apparently because the yard had foreclosed on his boat, The Foxy Lady, for nonpayment of his repair bill.

Zepetis went to see Marion Simcox to find out whether Simcox could help him. Simcox told Zepetis that he was trying to get the shipyard back, but that the court process takes a long time. Zepetis indicated that he didn't want to wait and that he would go to see Klein. Simcox testified that he told Zepetis that he couldn't buy stock, that everyone who had worked for Klein had been given stock, that none of it was any good, and that all stock was held by PRIDCO.

Zepetis later contacted Joseph Miranda to assist him in procuring San Juan Shipyard. Miranda testified that he conducted an investigation into the feasibility of purchasing the shipyard stock that included consulting with PRIDCO and checking the Puerto Rico State Department for the records of assets and liabilities of the yard and reviewing the bankruptcy file. Miranda also testified that he had visited the shipyard and that he was aware of the litigation involving the Simcoxs. Both the state department records and the bankruptcy file listed the total outstanding stock to be 1,156 shares.[4] Neither Miranda nor Zepetis were dissuaded by the fruits of their investigation and they began negotiations with Viking's agent, none other than Kenneth Klein.

On February 4, 1982, Miranda, Zepetis, and Zepetis' wife, Kathleen, formed International Shipbuilding Corp. (International), in order to buy the San Juan Shipyard stock. Miranda was named President of International. On February 5, 1982, Miranda and Zepetis flew to Tortola to execute the stock transfer with Viking. Miranda was chauffeured by Klein from the airport to the office of a Viking director, Shaun Murphy. The purchase and sale of the 2,100 shares was consummated on February 5, 1982, at Murphy's office, Viking headquarters.

Several aspects of the closing between Viking and International were unorthodox, to say the least. Miranda testified that he could not recall anyone being present at

4. The records for all years were not available.

the closing besides International, International's attorneys, and Klein. The purchase and sale agreement was, nonetheless, signed by Evelyn Stout, an alleged director of Viking. Since the original certificates were held by PRIDCO, International was given photocopies of the stock certificates and stock transfer forms. The copy numbered 7 was a copy of certificate No. 7 held by PRIDCO, but the copy numbered 8 was not a copy of certificate No. 8, but an altered copy of No. 7 to reflect the terms of No. 8, *i.e.*, the certificate number had been changed on the photocopy from 7 to 8 and the number of shares had been changed from 1,344 to 756.[5] The Viking to International transfer was executed on the back of the undated Farrow to Viking certificates No. 7 and No. 8. Although all of the language pertaining to the Viking to International transfer was set forth on the back sides of the forms used for the Farrow to Viking transfer, Miranda "inadvertently" filled in dates on the blank lines pertaining to the Farrow to Viking transaction on the fronts of the forms. He did not, however, fill in that day's date, he filled in the date February 3, 1982, the date two days earlier.[6] Miranda was not in Tortola on February 3 which, coincidentally or otherwise, was the date on which Viking had officially been chartered. Finally, the purchase and sale agreement contained no price.[7] Kathleen Zepetis, International's corporate secretary, testified on deposition that International had no business earnings and no bank accounts.

Eight days later, on February 12, 1982, the Simcoxs amended their complaint, added International as a defendant, sought to have the 2,100 shares then in the hands of International declared null and void and sought to have control of the shipyard returned to them.

On March 23, 1983, Farrow "ratified and resold" the 2,100 shares to Viking Investments Limited and on April 22, 1983, Viking "ratified and resold" to International. International tendered to Viking a promissory note on which it has paid nothing and half interest in a vessel owned by another entity in which Miranda had an interest.

On appeal, International does not contend that Klein and Maritime Enterprises, its predecessor, was fair to the Simcoxs or true to the spirit of his agreement with them. It does not even seriously claim to have been ignorant of the Simcoxs' plight. Rather, the thrust of International's argument is that the sales contracts between the Simcoxs and Klein/Klein Enterprises were not skillfully enough drafted to protect the Simcoxs and the thread of equity is not now long enough to guide them through the labyrinth of transactions and over the procedural hurdles they must navigate in order to obtain relief. Bearing in mind the broad and flexible powers inherent in equity jurisdiction, *Hecht v. Bowes*, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944), we examine the defendant's specific assignments of error.

## I. STANDING

Defendant first alleges that under Puerto Rico law only a shareholder can bring an action to challenge the overissuance or fraudulent issuance of stock. Because the Simcoxs do not have legal title to any San Juan Shipyard stock, defendant claims they have no standing to challenge the stock transactions.[8] P.R.Laws Ann. tit. 14, § 1206 (1978) provides:

> Want of corporate power shall not be pleaded or asserted in any action or pro-

---

5. PRIDCO held the original unaltered certificate No. 8.

6. The sides of the forms pertaining to the Viking to International transfer were correctly dated.

7. Murphy, a Viking director, had an attachment notarized stating the payment terms of the purchase and sales agreement but International's signature does not appear on that document.

8. The Simcoxs do have an undisputed security interest and proxy vote in 1,156 shares. Their security interest is, however, junior to PRIDCO's interest and neither the Simcoxs nor PRIDCO have formally foreclosed on their security interests.

ceeding except (a) by the Commonwealth of Puerto Rico ... or (b) by a stockholder or stockholders or the corporation or its directors or officers or any of them in an action or proceeding between them or any of them arising out of the conduct of the business or affairs of the corporation, provided that the rights of third parties shall not be affected thereby.

### A. Standing to Assert Overissuance

■ Section 1206 is directed at alleged *ultra vires* acts performed by a corporation in the course of its business or affairs. *United States v. Marin*, 651 F.2d 24, 29 n. 11 (1st Cir.1981); 1 Model Business Corporations Act Ann. § 7 (West 1971). The issuance of stock by the proper officer of a corporation is an act normally within the course of a corporation's business or affairs. The attempt to increase the stock of a company beyond the limit fixed by its charter is *ultra vires*. As the district court noted, the overissuance of stock beyond the power of the corporation is void, and confers no rights on the holders. *Scovill v. Thayer*, 15 Otto 143, 148, 105 U.S. 143, 148, 26 L.Ed. 968 (1881); 11 Fletcher, *Cyclopedia of the Law of Private Corporations*, § 5144, p. 208 (1971). Nonetheless, *ultra vires* acts fall squarely within the ambit of § 1206 and cannot be objected to except by stockholders, directors, officers, or the Commonwealth. Whether the Simcoxs' security interest and proxy vote coupled with an interest provide sufficient equitable ownership to bring the Simcoxs within the parameters of § 1206 is a question of state law we need not decide. The Simcoxs' right to disregard certificate No. 8 representing 756 shares on the grounds that those shares constituted an overissuance is immaterial to their ability to gain control of the shipyard because International holds a majority interest in the San Juan shipyard based on the 1,344 shares represented by certificate No. 7. All defenses to which the shares of certificate No. 7 are subject apply to the shares represented by certificate No. 8.

### B. Standing to Recover for Fraud

■ It is clear that § 1206 applies to disputes concerning the business and affairs of the corporation. Section 1206 does not, however, preclude a party from seeking redress for a personal injury caused by an actor in his private capacity simply because the actor uses his position in the corporation to assemble the weapons necessary to effect his private scheme. We, therefore, reject defendant's contention that § 1206 precludes the plaintiffs from seeking a rescission of the shares on the grounds that Klein defrauded them of payment and their security interest by fraudulently issuing and conveying 2,100 shares of stock.

### C. Form of Action

■ Defendant also alleges that plaintiffs do not meet the standing requirements of Federal Rule of Civil Procedure 23.1 applicable to stockholder derivative suits. International claims that the plaintiffs must have intended to sue on behalf of the corporation because San Juan Shipyard is named as a party and the administrative sheet prepared by the clerk's office designated the case as a stockholder derivative suit. We think it plain that the plaintiffs are asserting a private injury for which they seek personal redress and are not claiming damages on behalf of the corporation for any injuries sustained as a result of Klein's or International's conduct. *See Reifsnyder v. Pittsburgh Outdoor Advertising Co.*, 405 Pa. 142, 173 A.2d 319, 322 (1961) (action to prevent dilution of votes proper subject for direct action). The shipyard was named as a defendant to reflect the Simcoxs' status as pledgee of the yard's assets, not a nominal plaintiff as required in a derivative suit by Federal Rule of Civil Procedure 23.1. Clearly, the parties are not bound by the rough designation on the docket entry sheet entered by the district court clerk's office. The requirements of a shareholder commencing a derivative action do not apply. *See Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 896 (5th Cir.1968).

## II. SUFFICIENCY OF FRAUD PLEADINGS

 Defendant next claims that the Simcoxs did not allege the Klein issuance was fraudulent in the pleadings and that, therefore, fraud could not be an issue in the case and should not have been considered by the district court in determining whether International is entitled to the majority stock. Defendants rely on Federal Rule of Civil Procedure 9(b)[9] which requires: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally."

 Plaintiffs alleged in their amended complaint that Klein pledged all of the stock of San Juan Shipyard to the Simcoxs in the original purchase and sale agreement, that Klein executed a document entitled "proxy coupled with an interest" wherein he delivered his proxy vote to an escrow agent to be transferred to the Simcoxs in the event of default so that Marion Simcox could become custodial and operating receiver of the yard, and that Klein defaulted. It was further alleged that the plaintiffs voted themselves directors of San Juan Shipyard and released Klein from further obligation pursuant to their agreement, that Klein wrongfully issued more stock and wrongfully sold the stock to International, and that International knew of the particulars of that sale although the plaintiffs did not. Although the word "fraud" or "fraudulent" did not appear in the complaint, use of the word "fraud" is not indispensable to the pleading of a cause of action entitling the pleader to relief upon the ground of fraud. *Payne v. United States*, 247 F.2d 481 (8th Cir.), *cert. denied*, 355 U.S. 923, 78 S.Ct. 367, 2 L.Ed.2d 354 (1957); *Nolan Brothers, Inc. v. United States*, 266 F.2d 143, 145 (10th Cir.1959); *Tryforos v. Icarian Development Co., S.A.*, 47 F.R.D. 191, 195 (N.D.Ill.1969).

 Federal Rule of Civil Procedure 9(b) requires that the *circumstances* of fraud must be stated with particularity. 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1298 (West 1969). The purpose of the rule is to protect the defendant from unfair surprise and to discourage "strike suits." *See McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228–29 (1st Cir.1980); *Felton v. Walston*, 508 F.2d 577, 582 (2d Cir.1974). Here, plaintiffs recited virtually all of the characteristics of the stock transactions of which they were aware and they alleged that Klein and International were in a position to know the other details. While the Simcoxs' complaint did not explicitly aver that Klein intended to defraud them by issuing more stock, the complaint did recite the provisions of the supplemental agreement in which Klein, Maritime Enterprises, and San Juan Shipyard agreed to assist Marion Simcox in becoming custodial and operating receiver and the provision whereby the Simcoxs agreed to give Klein a 50% interest in the stock of the shipyard if they did not execute a release of personal liability to him. These provisions, executed within a month of the undisclosed issuance and transfer of 2,100 shares to a third party, certainly suggest that the issuance was intended to be part of a scheme to defraud the Simcoxs of their security interest in the yard. Since Rule 9(b) allows "malice, intent, knowledge, and other condition" to be averred generally, a "short and plain statement of the claim" is sufficient to meet the Rule 9 requirements with respect to intent. *McGinty*, 633 F.2d at 229; 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1301 (West 1969).

 Defendant claims that plaintiffs' action was based on a theory that a covenant between them and Klein prevented his issuance of more stock. Plaintiffs did plead such a covenant, but they also alternatively charged that "Klein wrongfully issued and sold stock." Although the

---

**9.** Since Fed.R.Civ.P. 9(b) is a special pleading requirement, it governs the procedure in federal courts in all diversity suits. State law, however, governs the burden of proving fraud at trial. 5 C. Wright and A. Miller, *Federal Practice and Procedure*, § 1296 (1969 and Supp.1984).

plaintiffs could have been more specific in their alternative allegation and stated how Klein, Maritime, and International had harmed the plaintiffs, Rule 9 must be read in conjunction with Rule 8 which provides that a complaint should not be struck for the failure to follow a form if the nature of the claim is apparent. *Producers Releasing Corp. v. Pathe Industries, Inc.,* 10 F.R.D. 29, 32 (D.C.N.Y.), *rev'd on other grounds,* 184 F.2d 1021 (2d Cir.1950); *cf. Loews, Inc. v. Mackinson,* 10 F.R.D. 36 (D.C.Ohio 1950) (where plaintiffs had sufficiently informed defendants of what conduct plaintiffs thought was fraudulent, motion for more definite statement that would unduly lengthen complaint in violation of 8(a) was denied); 5 C. Wright and A. Miller, *Federal Practice and Procedure,* § 1298 (West 1969).

 Defendant did not raise any objection to the form or specificity of the complaint by pretrial motion, in its answer, at the pretrial conference, or at trial. In fact at the pretrial conference, International explicitly sought resolution of whether the 2,100 shares that were issued to Kenneth Klein were legally issued and whether International was the legal owner of 2,100 shares of San Juan Shipyard's stock in addition to the agreed upon contested issues.[10] Where a defendant explicitly agrees to or interjects an issue in a pretrial agreement we do not believe he can later seek refuge in the technical requirements of Rule 9 because he does not like the result. *Carr v. Wisecup,* 263 F.2d 157 (3d Cir.1959); *United States v. Cushman,* 136 F.2d 815, 817 (9th Cir.), *cert. denied,* 320 U.S. 786, 64 S.Ct. 194, 88 L.Ed. 473 (1943); *United States v. State of Texas,* 523 F.Supp. 703, 720 (E.D.Tex.1981).

 Federal Rule of Civil Procedure 8(f) provides that "all pleadings shall be construed so as to do substantial justice." Considered as a whole, we find that the facts and circumstances pleaded in the complaint were sufficient to give notice to International of the nature of the claims against it and find no error in the district court's consideration of fraud. *See Payne v. United States,* 247 F.2d at 485–86.

## III. SUFFICIENCY OF THE EVIDENCE

 Defendant contends that the district court lacked sufficient evidence to find that the 2,100 shares issued by Klein were defective because they were fraudulently issued and aimed directly at prejudicing the Simcoxs. The district court made extensive findings of fact, but did not elaborately explain how those facts were percolated to produce the court's decision. We review the evidence bearing in mind that Rule 52 of the Federal Rules of Civil Procedure mandates that in actions tried upon the facts without a jury, the findings of the court shall not be set aside unless they are found to be clearly erroneous or were induced by an erroneous view of the law. *EAC Timberlane v. Pisces, Ltd.,* 745 F.2d 715, 722 (1st Cir.1984); *Pavlidis v. New England Patriots Football Club, Inc.,* 737 F.2d 1227, 1231 (1st Cir.1984). Due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses. *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); *United States v. United States Gypsum Co.,* 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948); *EAC Timberlane,* 745 F.2d at 722.

### A. The Issuance

In the original purchase and sale agreement, Klein and Klein Enterprises (a/k/a Maritime Enterprises) were comakers on a promissory note secured by all the outstanding shares of the shipyard's stock and the shipyard's assets. The "Pledge and Escrow Agreement" executed at the same

---

**10.** The parties' agreed statement of contested issues of fact and law included: (1) whether International was a bona fide owner of any interest in San Juan Shipyard, Inc., (2) whether the interest International Shipbuilding, claims in the stock it holds is void or defective because the stock was (a) an *ultra vires* issuance of stock; (b) an overissuance of stock; (c) issued without consideration; (d) fictitious; (e) not validly transferred; (f) not authorized by plaintiffs.

time as the purchase and sales agreement states:

> Pledgor hereby assigns, transfers, and pledges to Pledgee, subject to the terms and conditions hereinafter contained, One Thousand One Hundred Fifty Six (1,156) shares of common stock issued and outstanding of Stateside Services, Inc., consisting of all the outstanding stock of all classes of the corporation, evidenced by stock certificates 2, 4, and 5,—hereinafter referred to as the "Security."

Plaintiffs and defendant, as might be expected, disagree about whether the numerical description, "1,156," or the descriptive phrase, "consisting of all of the outstanding stock of all classes," should be construed as the operative language of the agreement. There is, however, no question that the Simcoxs held a security interest, junior to PRIDCO's interest, on all the shares that had been issued at the time of the sale of the shipyard. The testimony of the plaintiff's expert accountant witness, the testimony of shipyard employees, and the shipyard records all lead to the conclusion that Klein, as President of San Juan Shipyard, Inc., caused 2,100 shares of stock to be issued to himself without consideration. It is clear that the effect of the additional issuance of a majority of "bonus stock" and the subsequent conveyance of such stock diluted the value of the Simcoxs' security.

■ Both the Puerto Rico Commerce Code and the general Civil Code contain provisions authorizing rescission for contracts executed in fraud of creditors. P.R. Laws Ann. tiṭ. 10, § 1720 of the Commerce Code provides in pertinent part:

> The alienation of a commercial establishment of the whole or greater part of its stock, sold in a lump to one or several persons on the same day ... shall be presumed fraudulent, provided such alienation is made gratuitously or for half or less than half of the market price ... or in preference to, other creditors having the same or a better claim. In all cases mentioned in the preceding paragraph, the creditors shall have an action

to have the effected alienation rescinded and to have the ... stock sold or deposited at the disposal of the proper court. While § 1206 (*supra*, at 437–438) is more typically applied to situations in which a corporation conveys its own assets or stock to the prejudice of its creditors, *see, e.g.,* *United States v. Flores,* 535 F.2d 135, 139 (1st Cir.1976), nothing in the language of § 1206 restricts a cause of action to creditors of a corporation seeking repayment directly from the corporation. The evidence before us indicates that Klein issued a majority of the stock to himself without fair consideration. The obvious effect of such issuance was to dilute the Simcoxs' security interest in the corporation to such a point that their security was nearly worthless. We find Klein's issuance to have constituted an alienation of the San Juan Shipyard to the prejudice of the Simcoxs within the scope of § 1720.

■ Puerto Rico Laws Annotated tit. 31, § 3492(3) of the Puerto Rico Civil Code provides more generally for rescission of contracts "executed in fraud of creditors when the latter cannot recover, in any other manner, what is due them." In an action under § 3492 to rescind a conveyance for being in fraud of creditors, plaintiffs must allege and prove that (a) they are creditors; (b) Klein alienated his property in fraud of them; (c) they were injured by such alienation; and (d) the plaintiffs have no other remedy to recover their credit. *See Nine v. Aviles,* 53 P.R.R. 471, 475 (1938). In this case, the parties stipulated that the Simcoxs were creditors of Klein. The district court finding that the "issuance was aimed directly at prejudicing the Simcoxs" is well supported by the record. The district court in its findings of facts highlighted the provisions of the supplemental agreement which are inconsistent with the issuance and transfer of a majority interest in the shipyard made less than a month previously. Under Puerto Rico law, when shortly before the execution of a new agreement in substitution for matured and unpaid obligations a debtor transfers his properties, the conveyances,

insofar as the new agreement is concerned, can be considered as having been made in fraud of creditors. The subject of the new note or contract relates back to the day of the conveyance for the purpose of rescinding the transfer. *Roig Commercial Bank v. Portela*, 52 P.R.R. 626 (1938). Moreover, in the commercial context, contracts by which the debtor alienates property without valuable consideration are presumed to be executed in fraud of creditors. P.R.Laws Ann. tit. 31, § 3498 (1969).

█ Section 3492 also requires that plaintiffs show that they have no other manner of recovery in order to be entitled to rescission. The evidence shows that the Simcoxs made several attempts to renegotiate the terms of the purchase and sale agreement to assist Klein, Maritime Enterprises, and the shipyard to meet their obligations; unsuccessfully attempted to collect on their promissory note; attempted to exercise the default provisions of the contract; and obtained a default judgment against Klein and Maritime from which they have received no satisfaction. We think that plaintiffs have adequately shown that they have exhausted all other available remedies and have no other mode of recovery and that a finding of fraudulent conveyance is warranted under § 3492 as well as under § 1720 of the Commercial Code.

### B. *The Transfers*

█ After determining that the stock represented by certificates Nos. 7 and 8 had been fraudulently issued, the district court went on to hold that the 2,100 shares issued and conveyed by Klein were null and void. It is not clear whether the court based its conclusion on the fact that the stock had been fraudulently alienated or whether it found that the stock transactions were mere simulations. When a sale is simulated to defraud a creditor, the remedy is a declaration of nullity since the parties never made a valid contract. *Bank v. Portela*, 52 P.R.R. at 631. Where, however, a transfer of stock between two parties actually occurred, even if fraudulent as

to the plaintiffs, the contract is not a nullity but only subject to rescission. P.R.Laws Ann. tit. 31, § 3492 (1968); *Nine v. Avilles*, 53 P.R.R. 471, 472 (1938). The district court's findings of fact contain suggestions that the court was skeptical that the shares issued by San Juan Shipyard were actually transferred. For instance, the court found that "on February 4, 1974, Klein *purportedly* transferred ... certificates representing 2100 shares to one Eugene Farrow...", that "Farrow *allegedly* executed two transfers forms to Viking...," and that "Viking *allegedly* executed a transfer ... to International." (Emphasis added.) The court also noted that the records filed with the bankruptcy court and the Puerto Rico State Department do not reflect the issuance or transfer of the 2,100 shares. On the other hand, the district court made extensive findings of fact on International's status as a holder which suggests that the court found that the stock issuance and transfers occurred, *i.e.*, were not simulated, but that the stock was fraudulently transferred. The language used in the district court's conclusions also supports the view that fraud and not simulation was found. Therefore, we examine International's status as a holder to determine whether the transactions in which these fraudulently issued shares were transferred can be rescinded.

Defendant makes two arguments against rescission. First, it claims that a good faith purchaser takes free of all defects and there was not sufficient evidence for the district court to have found that International was not a good faith purchaser. Second, defendant contends that, even if it was not a good faith purchaser, it inherits the rights of any previous good faith purchaser and the previous "upstream" transactions were not shown to be defective.

Title 14 of Puerto Rico Laws Annotated delineates the commercial law of stock transfers in Puerto Rico. Section 1607 of that chapter provides:

> If the indorsement or delivery of a certificate was procured by fraud, duress or mistake; or if the delivery of a certifi-

cate was made without authority from the owner . . . the possession of the certificate may be reclaimed and the transfer thereof rescinded, unless—(1) The certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful. . . .

The district court found that International had ample notice of defects in the stock and was, therefore, not a holder in good faith. Miranda, International's President, testified that he reviewed the state department records and the bankruptcy file. The records and the file disclosed that only 1,156 shares had been issued, that 2,500 was the maximum number of shares authorized, and that Maritime Enterprises held 100% of the stock. Miranda further testified that he was aware of this suit prior to purchasing. The district court also highlighted the involvement of Klein in the Viking to International transaction and the opportunity for International to ascertain from Klein the nature of any defects in the validity of the shares. In addition, Marion Simcox testified that he warned Zepetis, a director of International, that the stock was no good. We find this, and other evidence in the record, more than sufficient to support the court's finding that International was not a good faith purchaser.

International further contends, however, that, even if it did not purchase the stock in good faith, the evidence was insufficient to find that neither Farrow nor Viking were good faith purchasers and that it was, therefore, entitled to the rights of a good faith purchaser. While the defendant does not cite any Puerto Rico statute or cases to support this proposition, Puerto Rico Laws Annotated tit. 14, §§ 1607 and 1608 arguably incorporate the "shelter doctrine" theory to which defendant refers.[11] Section 1607 states that certificates procured by fraud or mistake can be rescinded unless the certificate has been transferred to a purchaser for value and in good faith without notice of defects. The section does not specifically address rights against purchasers subsequent to a good faith purchaser, but the language of the statute appears to provide that the ability to seek rescission terminates once any good faith purchase has occurred. *See, supra,* at 442–443. Section 1608 provides:

> Although the transfer of a certificate or of the shares represented thereby has been rescinded or set aside, nevertheless, if the transferee has possession of the certificate or of a new certificate, subsequent transfer of such certificate by the transferee mediately or immediately to a purchaser for value in good faith, without notice of any facts making the transfer wrongful, shall give such purchaser an indefeasible right to the certificate and the share represented thereby.

Section 1608, like § 1607, does not explicitly speak of transferees subsequent to a purchaser in good faith. The use of the word "mediately" could mean either that a purchaser in good faith can buy through an agent or broker or that a mediate purchaser in good faith gives a subsequent purchaser an indefeasible right. The parties have not directed us to any Puerto Rico cases clarifying the scope of §§ 1607 and 1608 and we have found no cases that deal with this precise issue. The legislative history of title 14, Puerto Rico Laws Annotated reveals that the Puerto Rico law on stock transfers is based on Delaware corporation law and was intended to be consonant with the general commercial practice in the United States. *See* 7 Diario de Sessioner, tomo 2 at 546–547, 1233, 1234 (1956) (legislative hearings); *Revista Jundica de la Universidad de Puertó Rico* 187–188

---

**11.** The most common statement of the shelter doctrine is contained in the Uniform Commercial Code at § 8-301 of the Investment Securities Law and § 3-201 of the Negotiable Instrument Law. Section 3-201 provides, in pertinent part:

(1) Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course.

(1955–1956) (commentary). Forty-nine states have adopted the Uniform Commercial Code which incorporates the shelter doctrine, and Louisiana, the only state which has not adopted the code, has adopted the shelter principle. *See* La.Rev. Stat.Ann. tit. 10, § 3–201 (West 1983). Given the legislators' intent to make Puerto Rico stock transfer law consonant with the laws of the states, we shall assume that § 1608 was intended to provide the protection generally afforded transferees subsequent to bona fide purchases.

▮ The evidence on the upstream transfers between Viking and Farrow and Farrow and Klein is not nearly as extensive as the evidence presented on the Viking to International transfer. The evidence that was offered on the Farrow to Viking sale raises suspicions. First, Viking apparently purchased or was given the 2,100 shares represented by certificates No. 7 and No. 8 a year and a half before it became a legal entity. Second, the certificates were not properly completed; the date of the transfer was left blank (and later filled in by International's President, Miranda). The transfer was never recorded on the corporation's books. We, therefore, find that Viking would have had notice of any defects known by Farrow, the previous holder and a Viking director, and cannot shelter International.

The evidence on the character of the Klein to Farrow transfer is even more meager. Klein transferred the stock to Farrow on the same day as the stock was issued to him, but the new stock contained no transfer or holding restriction, was apparently regular on its face (the number of authorized shares was represented on both certificate Nos. 7 and 8 as 5,000 although in reality the stock authorization was limited to half that amount), and Klein as President of San Juan Shipyard was ostensibly authorized to issue the stock. No evidence was introduced on the communications between Farrow and Klein. On the other hand, the stock was never listed on the corporate books, although Farrow was the majority stockholder. Farrow and Klein apparently had an ongoing relationship as Klein remained in effective control of the yard after he was no longer the majority stockholder. Klein also acted as an agent for Viking in the negotiations with International (some of which occurred before Viking became a legal entity). Finally, Farrow's purchase of the stock for valuable consideration is thrust into doubt by his subsequent transfer of the stock to an entity that didn't exist and the transfer by that entity, of which he was a director, of the stock to International in exchange for a boat that International didn't own and a note on which International made no payments. The evidence on the Klein to Farrow transfer is ambiguous. It does not conclusively show that Farrow was not a good faith purchaser, but suggests that he was not.

In deciding what significance to accord the lack of evidence on the upstream Klein to Farrow transaction, we again turn to Puerto Rico law. The Puerto Rico Commerce Code does not specifically address whether the person seeking protection or challenging a transfer has the burden of demonstrating the status of the purchaser. Title 32 of Puerto Rico Laws Annotated addresses legal presumptions generally. The plaintiffs have directed us to Rule 16 of title 32 which provides in subsection 5 that the court shall presume that "evidence wilfully suppressed would be adverse if produced." P.R.Laws Ann. tit. 32, R. 16(5) (1983). Since Farrow was on the list of witnesses to be called by the defendant according to the pretrial conference agreement, the plaintiffs would have us infer that Farrow's testimony (along with the testimony of Klein, Murphy, Stout, and other defense witnesses who were parties to one or more transactions and who were listed in the pretrial conference agreement as witnesses the defense intended to call but who were not called at trial) would have been damaging to the defendant's case. Although the precise nature of Farrow's testimony is not known, presumably he would have testified to the nature of the transfers between himself and Klein and

himself and Viking and, perhaps, Viking and International. On the other hand, R. 16(19) of the same title provides "that private transactions [shall be presumed to] have been fair and regular." Since no direct evidence of irregularity or notice of defect in the Klein to Farrow transfer was offered, the R. 16(19) presumption would seem to favor defendant being sheltered by Farrow.

Puerto Rico Laws Annotated tit. 32, R. 17 (1983) directs that the prevailing presumption shall be the one based on considerations of logic and public policy but if the court deems that one consideration does not outweigh the other, both presumptions should be disregarded.

 In considering the public policy implications of the burden of proof in a shelter case, we must look to the law in other jurisdictions, as again, there is no relevant Puerto Rico law to which we can turn. Section 3–307(3) of the Uniform Commercial Code and Louisiana Revised Statute Annotated tit. 10, § 3–307 (West 1983) state:

> After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course.

It appears that this burden of proof shift is designed to balance the benefit given to purchasers who have notice of defects but who may be sheltered by a previous good faith purchaser. Moreover, transferees are in the best position to rebut evidence of irregular transactions in which they were a party. Here, International announced its intention to call Farrow who obviously was the individual best able to report on the transfers involving Klein and himself and himself and Viking. We find it equitable to impose upon defendant the duty to prove that the transfers afforded it the benefits of the shelter doctrine if it wishes to take advantage of a protection it cannot claim

directly. We, therefore, affirm the district court's finding that International was not shown to be a purchaser in good faith. We hold the plaintiffs are entitled to rescission of the transactions in which the stock was fraudulently issued and conveyed.

### C. Contractual Rights

Because the plaintiffs have released Klein from further obligation on the promissory note, they seek, in addition to rescission of the fraudulent conveyance, a judicial determination that the 2,100 shares and the rights incorporated in those shares are governed by the obligations set forth in the purchase and sale agreement and the supplemental agreement. The supplemental agreement contains the same ambiguity found in the original purchase and sale agreement regarding whether the stock referred to is all the outstanding stock or the 1,156 shares of stock outstanding at the time of the original purchase. *See, supra,* at 441. The proxy provisions are carefully worded to apply to "all the outstanding stock owned by Maritime Enterprises" which was not, at the time of the execution of the supplemental agreement, the holder of a majority interest in the shipyard. The agreement also provides, however, that, in the event of default, Klein, Maritime, and San Juan Shipyard agreed to and would assist in any necessary proceeding to allow Marion Simcox to become operating receiver and custodial receiver of the shipyard. A handwritten provision penned in the margin and initialed by the parties, provides that if Simcox becomes receiver and does not release Klein from all further obligation, he must convey 50% of the shipyard's stock to Klein. Such actions would hardly be possible if the majority stock was in control of another.

 Puerto Rico Laws Annotated tit. 31, § 3471 (1968) provides that if the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense will be observed, but if the words should appear

contrary to the evident intention of the contracting parties, the intention shall prevail. *Heirs of Raimirez v. Superior Court,* 81 P.R.R. 347, 349 (1959). In order to judge the intention of the contracting parties, attention must principally be paid to the parties' acts contemporaneous with and subsequent to the contract. P.R.Laws Ann. tit. 31, § 3472 (1968). In this case the actions of both the Simcoxs and Klein clearly indicate that the parties' professed intent was for the Simcoxs to be able to exercise control over the assets and management of San Juan Shipyard in the event of default in exchange for a release of obligation executed in favor of Klein.[12] We find that the Simcoxs have performed all of their obligations under the contract and are entitled to the rights contained therein, including the right to vote the proxy on all outstanding shares of San Juan Shipyard stock, the right to petition to have Marion Simcox appointed receiver and the right to honor the obligation of PRIDCO and foreclose on their pledge on the shipyard's stock. Our finding is not intended in any way to interfere with the jurisdiction of the bankruptcy court.

The orders of the district court are affirmed in all respects except that we find that the stock held by International is to be rescinded rather than declared a nullity.

Costs to appellees.

---

**12.** Although it is probable that Klein wished to convey the impression that his intention was consonant with the Simcoxs, his actual intent was to provide them with no interest. The language of an agreement will be interpreted according to the meaning given to it by one party if the other party had actual knowledge, or should have known, of the meaning intended by the other party. 3 *Corbin on Contracts* § 610 (West 1972).