423 A.2d 370

**George KROSNAR, Appellant at No. 2571,**

**v.**

**SCHMIDT KROSNAR MCNAUGHTON GARRETT CO., a Pennsylvania Corporation, and J. Donald Schmidt and Thomas A. Garrett, Appellants at No. 2572.**

Superior Court of Pennsylvania.

Argued June 4, 1979.

Filed Dec. 1, 1980.

528

530

Robert C. Saidis, Carlisle, for Krosnar, appellant at No. 2571 and appellee at No. 2572.

Richard C. Snelbaker, Mechanicsburg, for Schmidt et al., appellants at No. 2572 and for appellee at No. 2571.

Before PRICE, GATES and DOWLING, JJ.*

PRICE, Judge:

Following the filing of a petition for involuntary dissolution of the professional corporation of accountants known as Schmidt Krosnar McNaughton Garrett Company (hereinafter referred to as SKMG), the accountants associated with the corporation, J. Donald Schmidt, George Krosnar, Francis C. McNaughton and Thomas A. Garrett, agreed to abandon the action and voluntarily dissolve SKMG. They continued to disagree, however, as to the number of shareholders who retained an interest in the corporation at the time of dissolution and whether any of the parties had breached their fiduciary duty to the corporation. Seeking a division of the assets, Krosnar brought a suit in equity and trial was held before the Honorable Sylvia H. Rambo on July 6 and 7, 1977. Chancellor Rambo filed her adjudication and decree nisi on December 2, 1977, in which she found that only two shareholders, Krosnar and Schmidt, retained an equal interest in the corporation at dissolution and that none of the parties had violated their fiduciary duty to the corporation. She decreed that Schmidt pay Krosnar $2,603 to make the division of corporate assets equal between the two shareholders. Exceptions were filed by both parties, and after argument before the court of common pleas en banc, they were overruled and the decree nisi made final.

* President Judge G. THOMAS GATES of the Court of Common Pleas of Lebanon County and Judge JOHN C. DOWLING of the Court of Common Pleas of Dauphin County, Pennsylvania are sitting by special designation.

Krosnar filed the original appeal to this court and SKMG, Schmidt, and Garrett filed a cross appeal.[1] The issues raised in these appeals are as follows: (1) whether the court erred in its determination of the number of shareholders of the corporation; (2) whether the court erred in calculating the final distribution of assets and liabilities; (3) whether the court erred in refusing to find that Krosnar violated his fiduciary duty to the corporation; and (4) whether Krosnar should be permitted to recover interest on the sum to be paid him by Schmidt under the chancellor's decree. We hold that the findings of fact made by the chancellor are inadequate to allow this court to properly determine the second issue concerning the distribution of assets, and therefore, this case must be remanded to the court of common pleas for further proceedings with regard to this issue.

The facts developed at trial indicate the following sequence of events. In May of 1970, Krosnar, Schmidt and one Jay Nenninger formed an accounting partnership in which each owned, respectively, a twenty percent, forty percent and forty percent interest. On October 14, 1971, Krosnar and Schmidt formed the professional corporation of Schmidt Krosnar Company (hereinafter SK Company) with authority to issue 10,000 shares of stock. SK Company purchased all of Nenninger's interest in the partnership, and after Krosnar paid a sum to Schmidt to equalize the capital contribution to SK, stock was issued to Krosnar and Schmidt in equal amounts of 3,000 shares.

Schmidt and Krosnar later entered into negotiations with Garrett and McNaughton to merge their accounting practices with the result that the practices were pooled and the corporation renamed SKMG by amendment to the articles of incorporation. The amendment, filed with the Commonwealth of Pennsylvania on February 5, 1973, contained this language immediately following the specification of the change in name:

1. McNaughton was discontinued as a party to this suit in September of 1973 when he signed a release of all his claims against the corporation.

534

"NOTE: That Francis C. McNaughton and Thomas A. Garrett are now stockholders in this professional corporation and are qualified Certified Public Accountants . . . ."

All billings were made thereafter in the name of SKMG.

Differences arose between the four accountants, and in February 1973, McNaughton withdrew from the company. Although he remained in the same office within the SKMG suite, he effectively withdrew his assets since they became subject solely to his own use. This was especially indicated by the accounts receivable for the clients he was servicing, the collections from which he deposited in his own account. Thereafter, in March of 1973, Garrett also withdrew from his association with Krosnar and Schmidt. The assets and staff of his office in Lebanon, Pennsylvania, which had been used as a branch office of SKMG, returned to his sole control and he began billing clients using his own billhead rather than that of SKMG. By stipulation of the parties the date of dissolution of SKMG was fixed as April 11, 1973.

Our scope of review in equity matters is a limited one. The chancellor's findings of fact, affirmed by the court en banc, have the effect of a jury verdict and will not be reversed on appeal if adequate evidence is present to support them and they are not premised on erroneous inferences and deductions or an error of law. *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 351 A.2d 207 (1976); *Onorato v. Wissahickon Park, Inc.*, 430 Pa. 416, 244 A.2d 22 (1968). Thus, our function is not to substitute our view for the chancellor's but, rather, to determine whether a judicial mind, on due consideration of the evidence as a whole, could reasonably have reached the conclusion of the chancellor. ·*Aiken Industries, Inc. v. Estate of Wilson*, 477 Pa. 34, 383 A.2d 808 (1978); *Payne v. Kassab*, 468 Pa. 226, 361 A.2d 263 (1976). Nevertheless, conclusions of law or fact, being derived from nothing more than the chancellor's reasoning from underlying facts and not involving a determination of credibility of witnesses, are reviewable. *Felmlee v. Lockett*, 466 Pa. 1, 351 A.2d 273 (1976); *In re Estate of Thomas*, 463 Pa. 284, 344 A.2d 834 (1975).

■ Initially, we will examine the chancellor's determination of the number of shareholders in the corporation. The chancellor found that McNaughton and Garrett became co–equal shareholders in the corporation with Schmidt and Krosnar but withdrew from the corporation prior to its dissolution leaving Schmidt and Krosnar to divide the assets among themselves. Both parties disagree with this determination and claim that it affects the disposition of the assets. Krosnar claims that the court erred in finding that McNaughton and Garrett ever became shareholders while SKMG, Schmidt and Garrett maintain that the chancellor erred in finding only two shareholders remaining at the time of dissolution. They argue that unlike McNaughton, who signed a release to the other parties of his interest in the corporation, Garrett did not indicate any intent of giving up his corporate interest. We find ample evidence from the record to support the chancellor's conclusion that McNaughton and Garrett became equal shareholders of the corporation but later withdrew leaving Schmidt and Krosnar as the only parties entitled to a share of the assets remaining at the time of dissolution, and thus, we reject appellants' contentions.

■ Appellant Krosnar's contention that McNaughton and Garrett never became shareholders of SKMG is founded upon the premise that they could not have acquired stock because SKMG had no remaining authorized shares to issue to them. He argues that according to the articles of incorporation, SKMG had authority to issue only 10,000 shares of stock and that the articles and the amendment thereto indicated that the full amount of authorized shares had already been issued to Krosnar and Schmidt in blocks of 5,000 shares each. We agree that absent a proper amendment to the articles of incorporation, issuance of shares beyond the 10,000 share limit would be void as being beyond the power of the corporation. *Jutte v. Hutchinson*, 189 Pa. 218, 42 A. 123 (1899); 11 Fletcher Cyc.Corp. § 5144 (M.Wolf ed. 1971). Furthermore, stockholders have no power to ratify an issue beyond the charter limit. *Id.* at § 5146.

Nevertheless, another method existed by which McNaughton and Garrett could have acquired shares in the corporation—by transfer from Krosnar and Schmidt, the owners of the total stock issued by the corporation. Appellant Krosnar contends that the record is devoid of any evidence of a transfer and that in any case, the testimony indicates that Garrett's contribution was not equivalent to the share of the corporation allegedly received in return and that he, Krosnar, cannot be held to have sold his shares until he has received full consideration. We disagree with these contentions.

At the outset we note that shareholder status is particularly difficult to determine in this case because of the lax method employed by these accountants in maintaining the corporation. It is uncertain whether certificates for the original shares, by which transferral could be evidenced, were ever issued, and furthermore, a stockbook was not maintained by the corporation to record the owners of stock. The stock certificate is, however, only evidence of shareholder status and issuance is not a prerequisite to the formation of the relationship. *Commissioner v. Scatena*, 85 F.2d 729 (9th Cir. 1936); *Keystone Wrapping Machine Co. v. Bromeier*, 42 Pa.Super. 384 (1910). Moreover, the corporation need not issue a certificate unless it is demanded by the shareholder, and a shareholder may transfer shares without having a certificate. *Commonwealth v. Nixon*, 94 Pa.Super. 333 (1928).

The record is replete with evidence other than possession of certificates and notation in corporate books that indicates that shareholder status was created. As noted by the chancellor, McNaughton and Garrett were listed as shareholders in the amendment to the articles of incorporation. They were in all respects treated as equal shareholders, attending all meetings and apparently exercising an equal voice in decision making. In the petition for involuntary dissolution which precipitated this action, Garrett and McNaughton were named as shareholders.

■ Moreover, the contribution by these two men of all their assets and practice to the corporation was sufficient consideration to support the transfer of shares. By his behavior treating Garrett as an equal member, Krosnar accepted the consideration he offered and, although the value of his practice was not equal to the value of the shares of the corporation he received, Krosnar cannot now complain and defeat the transaction. Since this is not a case of the *issuance* of new shares for which the amount of consideration is strictly regulated by statute, *see* 15 P.S. §§ 1603 and 1604, it is governed by ordinary contract principles. One such principle is that valid consideration consists of any benefit conferred upon the promisor or detriment caused to the promisee that has been bargained for in exchange for the original promise. *Cardamone v. University of Pittsburgh*, 253 Pa.Super. 65, 384 A.2d 1228 (1978). It is well accepted that the court generally will not engage in an inquiry as to the adequacy of this exchange, *Thomas v. Thomas Flexible Coupling Co.*, 353 Pa. 591, 46 A.2d 212 (1946); *Hillcrest Foundation, Inc. v. McFeaters*, 332 Pa. 497, 2 A.2d 775 (1938), and we decline to do so here. The transfer being supported by proper consideration, the chancellor's conclusion that McNaughton and Garrett became shareholders is supported by the evidence.

■ It was also well within the chancellor's discretion to find that McNaughton and Garrett both terminated their relationship as shareholders.[2] Garrett admitted that he stopped practicing with Krosnar and Schmidt and the record is replete with testimony regarding the removal of his assets from the control of the corporation. It is argued that, unlike the facts of McNaughton's disassociation with the firm, there is no evidence that Garrett signed a release or transferred his stock, thereby relinquishing his interest in the corporation. This argument rests upon formalities that we do not find controlling in these circumstances. It is well

---

**2.** Since McNaughton has withdrawn from this suit and has signed a release of any interest he might have in the corporation, no argument is made concerning his status, and we need not address it any further herein.

established that in an appropriate case when justice to all parties requires, the court may treat the corporation and the individuals owning all of its stock and assets in an identical fashion. *Sams v. Redevelopment Authority*, 431 Pa. 240, 244 A.2d 779 (1968); *Gagnon v. Speback*, 389 Pa. 17, 131 A.2d 619 (1957). Particularly in equity, which elevates substance over form, the court will not hesitate to act to prevent the fiction of a corporate entity from leading to an unjust result. *Norris Tool & Machine Co. v. Rosenlund*, 355 Pa. 560, 50 A.2d 273 (1947).

Piercing the corporate veil is especially warranted under the instant facts because Garrett did not behave as a shareholder and himself disregarded the fiction that SKMG was a separate entity. *See Ashley v. Ashley*, 482 Pa. 228, 393 A.2d 637 (1978). Although when he became a member of the corporation he supposedly relinquished to the company his personal interest in his previous practice, he felt no compunction about reclaiming his practice and assets, without following any corporate formalities when he became disenchanted with the pooled arrangement. Having refused to abide by corporate formalities in his own dealings, he cannot now claim their benefit.

The chancellor, therefore, properly determined that the assets remaining in the corporation at the time of dissolution should be equally divided between Schmidt and Krosnar. The parties, however, take issue with respect to the items that should be included in the division. The first question concerns whether a liability assumed by Garrett in his practice before the merger of practices with the corporation was assumed by the corporation and remained as a corporate obligation after his withdrawal. Garrett had purchased the interest of his former partner, James Todd, payment of which was to be made in installments. In her findings of fact, the chancellor found that this obligation was indeed assumed by the corporation when Garrett became a shareholder and brought his practice into SKMG but that the obligation ceased to be a corporate one when Garrett withdrew his assets. We agree that the corporation is not liable

on this debt and it should not enter into the calculation of the final distribution of the corporate assets.

The evidence fully supports a finding that the Todd–Garrett obligation became the responsibility of SKMG. Although the mere fact that a corporation takes over the assets and business of a partnership does not make it liable for the latter's debts, *In re W. J. Marshall Co.*, 3 F.2d 192 (S.D.Ga.1924); 18 Am.Jur.2d *Corporations* § 18, when it appears that the property of a partnership is simply transferred to the corporation, often without consideration other than corporate stock being paid, and the business continues essentially unchanged as a result of incorporation, then the corporation may be found liable for the partnership debts. *Irby v. Davis*, 311 F.Supp. 577 (E.D.Ark.1970). *See Forest Laboratories, Inc. v. Pillsbury Co.*, 452 F.2d 621 (7th Cir. 1971); 149 A.L.R. 787, 797 (1944). The instant facts demonstrate that the continuity of the business was maintained. Furthermore, Garrett testified that he understood SKMG had assumed the obligation. The chancellor credited this statement, and since she was in a superior position to make that determination, we are bound by it. *Felmlee v. Lockett, supra.*

Once Garrett removed the assets from the corporation, however it would, as the chancellor concluded, be inequitable to find that the corporation's responsibility for this debt continued. Garrett removed the consideration for which the liability was assumed and, analogously to any other contractual undertaking, the assumption of the liability was no longer binding because of a failure of consideration. *Necho Coal Co. v. Denise Coal Co.*, 387 Pa. 567, 128 A.2d 771 (1957); Restatement of Contracts § 274 (1932).

Although we are urged by Schmidt and Garrett to evaluate this situation as a "true business arrangement" requiring "more than the 'equitable' reaction of the chancellor and the court en banc to relieve SKMG of its formerly recognized liability," (brief for appellants at No. 2572 at 17) we find this impossible to do in light of Garrett's failure to treat his commitments as a contractual undertaking. They argue

that he simply ceased rendering services and did not take any tangible goods from the corporation. The record indicates that at the time he joined the corporation, Garrett had merely continued to practice in the separate office he had maintained before the merger and that he simply continued to practice there following the breakup of the corporation. Thus, it was unnecessary for Garrett to physically move any assets. He continued to operate with the same staff and continued to service the files he had in his possession. He made it clear to Krosnar that his intent was to withdraw from the corporation, and his continued use of the assets that he had supposedly transferred to the corporation, in effect, deprived the corporation of their use. In light of these circumstances we agree with the chancellor's conclusion that the Todd–Garrett obligation ceased to be a debt of the corporation.

The second item in dispute is the clientele of the corporation. Krosnar points out that under Schmidt's and his written agreement with Nenninger, purchasing the latter's interest in the previous partnership, they agreed to treat clientele as an asset in the event of dissolution. He argues that the chancellor should have increased the asset valuation of SKMG by $203,500, the value he and Schmidt placed on SK Company as of the time of acquiring the Nenninger interest, to reflect the value of clientele and that he should be charged with only sixteen percent of this amount or $32,560, since in terms of the fees produced he retained only sixteen percent of the clientele. The remaining eighty–four percent or $170,940 he contends, should be charged to Schmidt. We disagree.

Although there was evidence that the clientele of SKMG dealt primarily with the staff, most of which was retained by Schmidt and not the principals, and that the contact of the staff had a definite bearing on the retention of a client, the chancellor astutely recognized that the clients were at all times free to seek other professional assistance. Since clients are not subject to control they cannot be treated as assets of the corporation. Moreover, analysis of

the other components of the asset valuation made by the chancellor shows that allowance has already been made for the fact that Schmidt continued work for a larger percentage of the clientele than did Krosnar. This extra value is reflected in the accounts receivable and work–in–process valuations with which each was charged. Finally, to accept Krosnar's clientele valuation of $203,500, we would have to assume that the value of clientele is equal to the net value of SK Company as of December 1, 1972. This value is entirely speculative: first, because it attempts to value the corporation's clientele on April 11, 1973 in terms of the business the corporation was doing in 1972, and second, because the net value figure includes items other than clientele, such as furniture and equipment. The chancellor committed no error in failing to include clientele as an asset.[3]

Third, Krosnar contends that the chancellor erred in her asset evaluation by charging him with furniture and equipment valued at $8,924. We agree with his contention that he should have been charged with only $5,342.

■ The chancellor apparently utilized exhibit 21 in determining the proper distribution of the assets of the corporation. Exhibit 21 was offered into evidence at trial and consisted of a chart prepared by Schmidt for use at trial purporting to summarize accountings made by Schmidt and Krosnar pursuant to a pre–trial agreement. Schmidt incorporated the $8,924 figure into this chart as the result of a letter from Krosnar's attorney stating that Krosnar valued the furniture and equipment at $8,924 less additional depreciation until the agreed time of dissolution. The letter is ambiguous as to whether this figure was intended as a valuation of the total furniture and equipment of the corporate office or merely the furniture that Krosnar retained in

**3.** Krosnar asserts that should we find clientele is not an asset subject to distribution, then he should be liable for only 16% of the obligation to Nenninger for his share of the original partnership. We disagree and find that since Krosnar and Schmidt were equal shareholders in SK at the time this obligation was assumed, they are equally liable.

his possession. Although Schmidt apparently accepted the latter interpretation, a close examination of Schmidt's own accounting indicates that the $8,924 figure was apparently offered as a valuation of the total furniture and not just what Krosnar retained. The $8,924 figure was derived by taking the valuation for furniture which Schmidt used in his accounting, (Record 489a), less depreciation, plus the value of a new typewriter that Krosnar kept in his possession. Schmidt charged himself with forty percent of his valuation, apparently as an estimate of the portion of the furniture of which he retained possession. Krosnar, therefore, should only be charged with the remaining sixty percent, or $5,342, after adjustment for additional depreciation and the typewriter.

Krosnar also alleges that the chancellor erred in evaluating the obligations that each party assumed and the valuation of uncollected accounts receivable. As to these two remaining issues, we are compelled to remand for the taking of testimony and findings of fact.

A clerical error was apparently made by the chancellor in calculating the figures $31,972 and $37,178 as Krosnar's and Schmidt's respective asset valuations. In her adjudication, the chancellor states that these figures were arrived at "after deductions of payments each made on the corporate obligations." (Adjudication at 3). Examination of exhibit 21, which as the court en banc found, was the foundation of the chancellor's calculations, discloses that the chancellor neglected to credit either party with the assumption of any corporate obligations. Although this court may correct a verdict to conform to the obvious intention of the court of common pleas, *Commonwealth ex rel. Larsen v. Larsen*, 211 Pa.Super. 30, 234 A.2d 18 (1967), we are unable to do so here because we lack any findings by the chancellor concerning the precise nature and amount of assumed obligations that are properly credited to each party. Therefore, rather than to attempt to amend the verdict, we feel the wiser course is to remand.

■ Furthermore, we also find that the valuation of accounts receivable uncollected accepted by the chancellor in her use of exhibit 21 is unsupported by the record. Although Schmidt's accounting worksheets indicate that his uncollected accounts receivable had a value of over $8,500, exhibit 21 values these accounts at zero, apparently on the theory that they are all bad debts. In contrast, Krosnar's uncollected accounts receivable were valued at 100 percent of the value recorded in the accounting worksheets. Since no testimony was adduced explaining why Schmidt's accounts should be valued by a different method than Krosnar's, we conclude that equity demands that they be treated in a similar manner. However, we would exceed our scope of review if we were to conclude at this time, without any testimony or findings of fact, that one method is more appropriate than the other. Thus, we must remand to permit testimony to be taken as to the most appropriate method of valuation for these accounts and to permit findings of fact to be made on this issue.

■ Although we must remand for further findings and proceedings relevant to the distribution of the assets, two remaining issues raised by the parties may be disposed of at this time. Schmidt, Garrett and SKMG contend that the chancellor erred in failing to find that Krosnar breached his fiduciary duty to the corporation by causing internal dissension in an attempt to destroy the corporation, by retaining corporate records and files, and by attempting to control and convert corporate employees and assets. The chancellor pierced the corporate veil and treated the parties herein as individuals. Finding that the enterprise failed because of personal differences and that each reacted naturally in trying to salvage a portion of the business and continue operating through the busiest time of the year, the chancellor refused to assign liability for a breach of fiduciary duty. Although the record supports the chancellor's analysis that the scramble during the time that dissolution of the corporation was being sought is attributable to the natural reaction of individuals and that the parties should be treated as such

rather than in the corporate framework, this finding does not dispense with the question whether fiduciary duties were breached. A confidential relation is not confined to any specific association of the parties, *Young v. Kaye*, 443 Pa. 335, 279 A.2d 759 (1971). Even as individuals, a confidential relationship was created between the parties by virtue of their business relations. They occupied positions of trust and confidence with respect to each other and undertook to act in good faith in their dealings and to refrain from using their position to another's detriment and their own advantage. *McCown v. Fraser*, 327 Pa. 561, 192 A. 674 (1937); *Null's Estate*, 302 Pa. 64, 153 A. 137 (1930). However, as the court en banc noted in its examination of this issue, "there is enough blame to be equally shared by each party to this action." (slip op. at 5). Thus, Schmidt and Garrett are as tainted with bad faith relative to this matter as they accuse Krosnar of being. The parties have violated the clean hands doctrine so as to bar the equitable relief that they seek. *See Stauffer v. Stauffer*, 465 Pa. 558, 351 A.2d 236 (1976); *Harbor Marine Co. v. Nolan*, 244 Pa.Super. 102, 366 A.2d 936 (1976).

■ The final issue with which we are confronted is whether Krosnar is entitled to interest from the date of the decree nisi on any amount Schmidt is ordered to pay him.[4] We recognize that the Act of April 6, 1859, P.L. 381, § 1, 12 P.S. § 781, provides that interest is an incident to a judgment in the court of common pleas. However, in light of our decision to vacate the award and remand this case for further proceedings regarding the specific division of the assets, no predicate award is present on which to base interest. *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976). Krosnar's request for the award of interest is, therefore, denied.

4. Krosnar's exception to the decree nisi states that the chancellor erred in refusing to award interest from April 11, 1973, the stipulated date of dissolution. We agree with the court en banc's denial of interest from that date until the date of the decree nisi as such an award would require a special order from the chancellor.

We affirm the decree with the exception of those portions valuing the assets. For the reasons stated, we vacate those portions of the decree and remand for further proceedings, consistent with this opinion, concerning the proper adjustments to be made in the distribution of assets, with the right of either party to file exceptions to any additional findings of fact.