488 So.2d 864 (1986)
Frances Louise WOLFSON, F/K/a Frances W. Cary, Appellant,
v.
Elton M. CARY, Appellee.
Nos. 85-398, 85-571 and 85-725.
District Court of Appeal of Florida, Third District.
May 13, 1986.
Rehearing Denied June 18, 1986.
*865 Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin and Joel S. Perwin, Miami, for appellant.
Lapidus & Stettin, Miami, Ruden, Barnett, McClosky, Schuster & Russell and Woodrow "Mac" Melvin, Jr., and Cindy Niad-Hannah (Ft. Lauderdale); Daniels & Hicks and Mark Hicks, Miami, for appellee.
Before HENDRY, HUBBART and NESBITT, JJ.
HENDRY, Judge.
Petitioner Frances L. Wolfson appeals a final judgment denying her a special equity in respondent Elton M. Cary's property and denying her motion for a permanent injunction against the use of three shares of common stock referred to in her petition for dissolution of marriage. Petitioner further appeals a final order of the court distributing a tax refund equally between herself and respondent.[1]
*866 The relevant facts are as follows. Appellant Frances L. Wolfson[2] married appellee Elton Cary in 1968. Ms. Wolfson's father, Mitchell "Colonel" Wolfson, was the founder and Chairman of Wometco Enterprises, Inc. She was the beneficiary of a trust established by her father which consisted of a substantial bloc of Wometco stock. Ms. Wolfson obtained legal title to the stock in 1972. Ms. Wolfson's husband, Elton Cary, was the sole owner of Adae & Hooper Insurance, Inc.
In 1973, the couple decided to establish an insurance company. They agreed to make equal capital contributions and in return, each was to receive 50% of the stock in the company. Shortly thereafter, they incorporated G.I.C. Corp. (GIC) as the parent holding company for General Insurance Company, Inc., General Insurance Managers, Inc., General Insurance Adjustors, Inc., and Adae & Hooper Insurance, Inc. In order to capitalize GIC, Mr. Cary contributed all of his interest in Adae & Hooper Insurance, Inc., valued at somewhere between $440,000 and $575,000, and Ms. Wolfson contributed a portion of her Wometco stock valued at $440,000. In addition, Ms. Wolfson pledged some of her Wometco stock as collateral for an $850,000 loan to GIC. This loan was later satisfied. GIC's articles of incorporation authorized the company to issue up to 5,000 shares of common stock and 1,000 shares of preferred stock. Subsequently, 5,000 shares of GIC common stock were issued and Ms. Wolfson and Mr. Cary each received 2,500 shares. No preferred shares were issued.
There were four directors elected to the GIC board: Ms. Wolfson, Mr. Cary, Thomas Trantham and Arthur Hertz. Mr. Cary was elected chairman and Ms. Wolfson was elected vice president and secretary.
In 1978, after five years of operation, it was felt that GIC required additional capital funds. Ms. Wolfson contributed more of her Wometco stock, valued at $2.2 million. Mr. Cary executed a note for $2.2 million in favor of GIC and gave Ms. Wolfson his proxy until such time as the note was paid off. The purpose of the note was to assure that the investments made by the parties continued to be substantially equivalent.
In September, 1983, Ms. Wolfson petitioned for dissolution of the marriage. In her prayer for relief, Ms. Wolfson sought a special equity in her husband's 2,500 shares of GIC stock, based upon the inequality of the couple's capital contributions. Mr. Cary answered the petition and claimed a special equity in his wife's non-marital assets, including her shares of GIC stock, on the ground that her assets had increased in value due to his business and management skills.
In December, 1983, Mr. Cary obtained a $2.5 million loan from Southeast Bank which he in part used to satisfy his note with GIC. He pledged all of his assets, including his 2,500 shares of GIC stock, as collateral for the loan. Mr. Cary paid off the note to GIC and secured the return of his proxy.
Unaware that her husband had obtained the return of his proxy, Ms. Wolfson sought on January 13, 1984 to replace her husband and Mr. Trantham as directors of GIC. This effort failed as she and her husband each held an equal amount of shares. On January 26, 1984, Mr. Trantham and Mr. Cary voted to appoint Donald Aronow to fill the vacancy on the board of directors created by the resignation of Mr. Hertz. On March 5, 1984, a special meeting of the GIC board was held, at which Mr. Aronow, Mr. Trantham and Mr. Cary voted to amend the bylaws to require that each director of the corporation be a shareholder. To satisfy this requirement, the board issued 1,000 shares of preferred stock. This preferred stock provided for a *867 right of conversion into shares of common stock at the rate of 250 shares of preferred stock for each one share of common stock. The board then offered the 250 shares of preferred stock to each of the four directors at a purchase price of $14.00 per share. According to Mr. Cary, the purpose behind the issuance of the convertible preferred shares was to prevent Ms. Wolfson from using her stock to vote a deadlock among the stockholders and force the statutory dissolution of the company.
Immediately upon the conclusion of the special meeting, a copy of the board's resolution was filed with the Florida Secretary of State. Upon such filing, Mr. Aronow, Mr. Trantham and Mr. Cary each purchased 250 shares of preferred stock. Ms. Wolfson was also tendered the right to purchase the preferred shares, but declined to do so. Upon receipt of the stock certificates, the three directors tendered their preferred shares back to GIC, requesting the conversion of their shares to common stock. The corporation in return issued to each of the directors one share of common stock. Thus, Mr. Cary acquired one more share of common stock, bringing his total number of shares to 2,501.[3] Mr. Aronow acquired one share of common stock, as did Mr. Trantham. The impact of this transaction was to reduce Ms. Wolfson's and Mr. Cary's stock ownership from 50% to 49% each. On March 30, 1984, Ms. Wolfson secured a temporary restraining order which enjoined the GIC directors from using the three newly-issued shares of common stock.
In April, 1984, all of the stock of Wometco Enterprises, Inc. was sold at the price of $46.50 per share. GIC received approximately $19 million for the Wometco stock that Ms. Wolfson had invested in the corporation. Shortly thereafter, Mr. Cary moved to amend his counter-petition to include the allegation that Ms. Wolfson's Wometco stock had sold at such a high price as a direct result of his extraordinary services to that company.[4] Ms. Wolfson moved to amend her petition to include an application for a permanent injunction with respect to the use of the newly-issued shares and to add the GIC directors and its subsidiaries as parties to the cause. Both parties' motions to amend were granted.
The case was tried non-jury. Evidence was offered that Mr. Cary owed GIC approximately $2.3 million, that the only substantial asset he owned was his one-half interest in the company and that he had drawn over $1.8 million in salary from the company. Evidence was also offered that Ms. Wolfson had a net worth of between $50 and $60 million, not including her one-half interest in GIC. Following trial, the court entered a final judgment dissolving the marriage. It denied the parties' requests for a special equity in each other's property and dissolved the temporary restraining order against the use of the three common shares. The court reserved jurisdiction to rule on the distribution of the parties' 1983 federal income tax refund.
The court later held a post-judgment hearing on the distribution of the tax refund, which totalled $78,353, plus interest. It was conceded by the parties that, although they were separated at the time, they had filed a joint return for the 1983 tax year. Ms. Wolfson offered evidence that a company separately owned by her, Marine Reinsurance Corp., had experienced a 1983 income loss of $976,059. This loss, coupled with Ms. Wolfson's other income and deductions, would have resulted in a net taxable loss to her of $303,814. During the same year, Mr. Cary's income and deductions would have resulted in a federal income tax liability of $133,510, had he filed a separate return. Mr. Cary offered evidence that Marine Reinsurance acted as a reinsurer of business generated by General Insurance Co., a GIC subsidiary, that Mr. Cary founded Marine Reinsurance and *868 that Marine Reinsurance was regularly used by the couple as part of their tax planning. The trial court ordered that the tax return be divided equally between them. Ms. Wolfson filed two appeals from the final judgment dissolving the marriage [Case Nos. 85-398, 85-571] and also filed an appeal from the order on distribution of the tax return [Case No. 85-725]. These three appeals were consolidated by order of this court.
The three issues presented for our consideration are: (1) whether the issuance of the three shares of common stock upon conversion from preferred stock was contrary to the law, since all the authorized common stock had already been fully issued; (2) whether there is competent substantial evidence to support the trial court's denial of Ms. Wolfson's claim for a special equity in Mr. Cary's GIC shares; and (3) whether the trial court erred in distributing the 1983 federal income tax refund equally between the parties.
On the question whether the issuance of the three shares of common stock was contrary to the law, we find the shares were issued illegally and, accordingly, are void.
At its inception, GIC's articles of incorporation authorized two classes of stock: 5,000 shares of common stock and 1,000 shares of preferred stock. At its organizational meeting, GIC's board of directors issued all 5,000 shares of the common stock, but did not issue any of the preferred stock.
The issuance of the three shares of common stock in 1984 caused the number of common shares outstanding to be in excess of the common shares authorized in its articles of incorporation.
It is a well settled rule that any issue of stock by a corporation in excess of the amount prescribed in its articles of incorporation is ultra vires and the stock so issued is void. Scovill v. Thayer, 105 U.S. 143, 15 (Otto) 143, 26 L.Ed. 968 (1882); Simcox v. San Juan Shipyard, Inc., 754 F.2d 430 (1st Cir.1985); Kaiser v. Moulton, 631 S.W.2d 44 (Mo. App. 1981); Gonseth v. K & K Oil Co., 439 S.W.2d 18 (Mo. App. 1969); Krosnar v. Schmidt Krosnar McNaughton Garrett Co., 282 Pa.Super. 526, 423 A.2d 370 (1980); 11 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5144 (rev. perm. ed. 1971 & Supp. 1985). Any overissue beyond the authorized amount of each class of stock is void. Taylor v. Lounsbury-Soule Co., 106 Conn. 41, 137 A. 159, 162 (1927).
Mr. Cary and his co-directors contend that there is no overissue so long as the number of shares of stock outstanding (here, 5003) does not exceed the aggregate number of common and preferred shares authorized in the articles of incorporation (here, 6000).[5] We find this assertion contrary to the intendments of the Florida General Corporation Act, Ch. 607, Fla. Stat. (1983). The General Corporation Act requires the articles of incorporation to set forth the aggregate number of shares that the corporation shall have authority to issue and, if such shares are to be divided into classes, the number of shares of each class. § 607.164(1)(d), Fla. Stat. (1985). The articles of incorporation must be amended to "increase ... the aggregate number of ... shares of any class which the corporation has authority to issue." § 607.177(2)(d), Fla. Stat. (1985). An amendment to the articles of incorporation to increase the aggregate number of authorized shares of a class requires the holders of the shares of that class to vote as a class upon the proposed amendment. § 607.184(1)(a), Fla. Stat. (1985). Thus, a board of directors cannot circumvent the requirements *869 of the General Corporation Act by increasing the number of "authorized" shares of a class of stock without amending the articles of incorporation. See § 607.177(2)(d), .184(1)(a), Fla. Stat. (1985). See generally, Scovill v. Thayer, 105 U.S. (15 Otto) at 148; Simcox v. San Juan Shipyards, 754 F.2d at 438; Kaiser v. Moulton, 631 S.W.2d at 47; Gonseth v. K & K Oil, 439 S.W.2d at 23; Krosnar v. Schmidt Krosnar, 423 A.2d at 374; 11 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5144.
Accordingly, we find the three shares issued in excess of the amount of common shares authorized in GIC's articles of incorporation to be void.
The next question presented for our consideration is whether there is competent substantial evidence to support the trial court's denial of Ms. Wolfson's claim for a special equity in Mr. Cary's GIC shares.
The term "special equity" describes a vested interest in property brought into the marriage or acquired during the marriage because of contribution of services or funds over and above normal marital duties. Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980); Hernandez v. Hernandez, 444 So.2d 35 (Fla. 3d DCA 1983), review denied, 451 So.2d 848 (Fla. 1984). When property is purchased or improved with the non-marital assets of both spouses, one spouse is entitled to a special equity in the other spouse's share of that property to the extent that one spouse's contribution exceeds that of the other spouse. See Starcher v. Starcher, 391 So.2d 340 (Fla. 4th DCA 1980), after remand, 430 So.2d 991 (Fla. 4th DCA 1983); see also Landay v. Landay, 429 So.2d 1197 (Fla. 1983); Gregg v. Gregg, 474 So.2d 262 (Fla. 3d DCA 1985). Ms. Wolfson contends that her non-marital capital contributions to GIC were greatly in excess of Mr. Cary's, thus entitling her to a special equity in his shares of stock in the corporation. We do not agree.
We find the record contains competent substantial evidence upon which the trial court could have found that the parties' contributions to GIC were relatively equal. In 1973, the parties agreed to make equal capital contributions to the formation of GIC. Mr. Cary contributed Adae & Hooper stock, valued at between $440,000 and $575,000. Ms. Wolfson contributed Wometco stock valued at $440,000. Four years later, Ms. Wolfson contributed more Wometco stock, this time with a value of $2.2 million. Mr. Cary contributed his personal note to GIC for $2.2 million. Subsequently, he obtained a bank loan and paid off the GIC note with the proceeds.
Ms. Wolfson contends that Mr. Cary's loan proceeds do not constitute a net contribution to GIC. We are unpersuaded by this argument. Proceeds from a bank loan under which one party is solely liable can constitute a separate non-marital asset. Kaylor v. Kaylor, 390 So.2d 752 (Fla. 4th DCA 1980); Italiane v. Italiane, 342 So.2d 1003 (Fla. 4th DCA 1977). Since the trial court's findings of fact in denying the claim for a special equity are presumed to be correct, Marsh v. Marsh, 419 So.2d 629 (Fla. 1982), which presumption has not been overcome sub judice, and since the trial court correctly applied the law, we hold the court did not err in denying Ms. Wolfson's special equity claim.
The final issue for our consideration is whether the trial court erred in equally distributing a tax refund between the parties. Ms. Wolfson contends that she is entitled to a special equity in the full amount of the refund. Specifically, she argues that a business wholly owned by her, Marine Reinsurance, had experienced a 1983 income loss of $976,059 and that, had she filed separately, she would have owed no federal income tax in 1983. Further, had Mr. Cary filed separately, he would have had an income tax liability of $133,510. Appellant cites Ball v. Ball, 335 So.2d 5 (Fla. 1976), as authority for establishing her right to a special equity in the refund. In Ball v. Ball, 335 So.2d at 7, the court held that "a special equity is created by an unrebutted showing ... that all of the consideration for property held as tenants by the entireties was supplied by one spouse from a source clearly unconnected with the marital relationship."
*870 In the instant case, there was competent substantial evidence upon which the trial court could have found that the tax refund was generated from a source connected with the marital relationship. Marine Reinsurance acted as a reinsurer of insurance business generated by General Insurance Co., a subsidiary of GIC which was owned by the parties. Mr. Cary founded Marine Reinsurance and it was regularly used by the couple as part of their tax planning. Other facts also lead us to the conclusion that the trial court did not err. Ms. Wolfson voluntarily chose to file a joint 1983 tax return, even though the couple was separated at the time and she knew that a tax refund would result. Under these circumstances, we find the trial court did not abuse its discretion in equally distributing the refund.
Given the foregoing reasons and based upon the authorities cited, the portion of the final judgment denying Ms. Wolfson a special equity is affirmed; the portion of the judgment dissolving the temporary restraining order with respect to the three shares of common stock is reversed and the three shares are held to be void; and the order distributing the tax refund equally between the parties is affirmed.
Affirmed in part and reversed in part.
NOTES
[1] Mr. Cary filed a notice of cross-appeal from the final judgment. He did not specifically argue such cross-appeal, but argued generally his right to a special equity in Ms. Wolfson's assets in the event this court remands the case for a new trial.
[2] Frances Wolfson was formerly known as Frances W. Cary. The final judgment of dissolution restored her maiden name. She will be referred to throughout this opinion as "Ms. Wolfson."
[3] Since Mr. Cary held the right to vote Mr. Trantham's share due to an agreement entered into between the two, this brought his actual total voting power to 2,502 shares.
[4] Mr. Cary had been elected Chairman of Wometco Enterprises, Inc. after Colonel Wolfson's death, and presided over the company's sale.
[5] They cite Larsen v. Lilly Estate, 34 Wash.2d 39, 208 P.2d 150 (1949), as authority for this proposition. The court held in Larsen, 208 P.2d at 157, that there was no overissue of common stock where the articles of incorporation provided for the conversion of preferred stock into common stock. In Larsen, unlike in the instant case, the articles of incorporation specifically provided for preferred stock with a conversion right. GIC's articles of incorporation only gave the board of directors the general power to determine the relative rights and preferences of the preferred shares.