617 A.2d 1326

Ronald L. WILKINSON and Ellen U. Wilkinson

v.

Keith REITNAUER, Appellant.

Superior Court of Pennsylvania.

Argued Aug. 25, 1992.

Filed Dec. 29, 1992.

346

Craig S. Boyd, Boyertown, for appellant.

Henry T. Crocker, Pottstown, for appellees.

Before BECK, JOHNSON and HOFFMAN, JJ.

BECK, Judge:

The issue is whether appellees' transfer of $8900 to appellant was in the form of a non-refundable purchase of corporate stock or a loan which appellant must return to appellees.

The following facts were established during a bench trial. Appellant Keith Reitnauer was the sole shareholder of stock in R.W. Optics, Inc., a Pennsylvania corporation. On or about December 30, 1982, appellees Ronald and Ellen Wilkinson lent $3000 to Reitnauer. The loan was memorialized in a note, handwritten by Reitnauer and signed by all three parties, in which Reitnauer agreed "to pay Ronald + Ellen Wilkinson three thousand (3000) dollars at an annual rate of 11%."

Later, the parties orally agreed upon a new arrangement, whereby the Wilkinsons would provide Reitnauer a total of $8900, as either a loan or a purchase of equity shares in R.W. Optics, Inc. On or about February 16, 1983, the Wilkinsons paid
Reitnauer an additional $1000 towards the total of $8900, and their new agreement was memorialized in a second handwritten note, signed by all parties:

> I, Keith Reitnauer acknowledge payment of a total of $4000.00 from Ronald + Ellen Wilkinson. This $4000.00 is to be deducted from his total due of $8900.00, leaving a balance of $4900.00 due for the 49% of the shares of R.W. Optics, Inc. *If this purchase should not take place, it is understood by all parties that the $4000 will become a loan payable by Keith Reitnauer at an interest rate of 11%,* calculated from the time the oral purchase agreement is cancelled.

(Emphasis added).

The Wilkinsons eventually paid Reitnauer another $4900, although it is not clear from the record exactly when and how this took place. However, Wilkinson and Reitnauer both testified that the total of $8900 had already changed hands when they executed a third document. This "Agreement for

the Sale of Stock," dated March 14, 1983, provides, in pertinent part, as follows:

\* \* \* \* \* \*

3. Reitnauer hereby agrees to sell, and Wilkinson agrees to purchase upon the terms and conditions set forth herein, four hundred thirty-six (436) shares of the common stock [in R.W.Optics] held by Reitnauer, upon payment from Wilkinson to Reitnauer of the sum of Eight Thousand Nine Hundred Dollars ($8900).

4. Upon the sale of said four hundred thirty-six (436) shares of common stock to Wilkinson, Reitnauer will be the owner of approximately fifty-one per cent (51%) of the issued and outstanding shares of stock of R.W.Optics, Inc., and Wilkinson will be the owner of approximately forty-nine per cent (49%) of the issued and outstanding shares of R.W.Optics, Inc.

\* \* \*

Wilkinson also agreed to assume equal responsibility with Reitnauer for the payment of certain debts of the corporation. The Agreement of March 14, 1983 does not set forth a specific effective date for the purchase of shares, nor does it include a requirement that the stock certificates physically be given to Wilkinson. Testimony established that Wilkinson never obtained physical possession of the shares.[1]

By this time, Ronald Wilkinson was employed by R.W. Optics, Inc., and he received a salary. He also began to hold himself out to customers and relatives as the vice-president of the corporation. In addition, Wilkinson signed a written statement on R.W. Optics letterhead in which he averred that he "accepted and purchased forty-nine percent (49%) of the stock in the corporation." Wilkinson signed the statement as

1. Reitnauer testified that it was his understanding that all of the share certificates, including his own, had been prepared and were kept in his lawyer's office. Although Reitnauer admitted that he never actually gave shares of stock to Wilkinson, Reitnauer testified that the certificates were available to Wilkinson if he wished to obtain possession of them. Wilkinson testified that he had asked Reitnauer for the stock certificates, but he never took any action to compel their transfer.

the corporation's vice-president, and indicated that he was a "partner" with Keith Reitnauer.[2]

Unfortunately, despite Wilkinson's high hopes for his business opportunity with R.W. Optics, the company did not flourish. In a letter dated June 11, 1984 addressed to Reitnauer, Wilkinson resigned from R.W. Optics. In the letter, Wilkinson demanded that "the total *investment* of Eight Thousand Nine Hundred Dollars ($8900.00) will be refunded to Mrs. Ellen U. Wilkinson within two weeks from receipt of this letter." (Emphasis added.)

On June 18, 1984, Wilkinson wrote a second letter to Reitnauer, reminding him that "there is one week remaining to pay me and my wife's *Investment/Loan* of $8900.00 ... back in accordance to our agreement dated February 16, 1983, written in your handwriting, and signed by all parties concerned." Wilkinson further stated his belief that the conditional stock purchase agreement never was finalized, and that the money paid to Reitnauer merely was a loan that Reitnauer must repay:

Due to the fact that since February 16, 1983 to June 11, 1984 we could not come to an agreement, a considerable amount of time was wasted and an undue financial burden

2. The Statement provided:
 I, Ronald L. Wilkinson, wish to make the following statement concerning my bankruptcy.... My bankruptcy was caused mainly to a cash flow problem. I was able to keep the business going for three (3) years but during that time the state of the economy was very low. In January 1983 I was asked by Keith Reitnauer *to become a partner* in his wholesale business (R & W Optics). Because of my fast growing family of five (5) children, my dream to become successful in business, and all my responsibilities, *I accepted and purchased forty-nine percent (49%) of the stock in the corporation.* With my determination and confidence in myself as well as Keith Reitnauer, this business will not fail. I have learned many valuable lessons from my last business. Experience is your best teacher. Therefore, I am hopeful that my bankruptcy, that happened in 1980, will have no ill effect on your decision for the corporation's future. Thank you for your time and consideration in this matter.
 /s/ Ronald L. Wilkinson
 Ronald L. Wilkinson, Vice–President
 Marketing/Production
(Emphasis added). Wilkinson testified that he did not recall the purpose of the statement, although he admitted reviewing and signing it.

put on my family. Therefore, this agreement should be honored by you, as we did, and payment is expected to begin next week so further action will not have to be taken. . . .

When no payment was forthcoming from Reitnauer, the Wilkinsons commenced this action. Reitnauer then wrote to Wilkinson, confirming that the parties had entered into an Agreement for the Sale of Stock on March 14, 1983, and that they had also executed an additional "buy-sell agreement," [3] which agreements "void any previous loan-note agreement and prove to you that you had made a purchase and not a loan."

After trial, the court found that any agreement between the parties for a purchase of shares was executory, that the condition of a transfer of shares never took place, and that the payment of $8900 was in the form of a loan which must be returned to the Wilkinsons. The trial court also found that the "corporation was never really born. . . . There's no evidence that there was any incorporation meeting. There's no evidence that there was a shareholders meeting at which stock was authorized and issued. There's no evidence that the agreement to sell the stock for $8900 to Mr. Wilkinson on the terms set forth in the agreement was approved by the corporation. There's no evidence that there were any certificates of stock prepared, signed by the necessary officers, and tendered, or offered, to Mr. Reitnauer." N.T. 7/19/91 at 80–81. The court concluded that because the executory agreement of sale of stock never became final within a reasonable time, the Wilkinsons had a right to rescind it and demand their money back. Reitnauer filed a post-trial motion for judgment notwithstanding the verdict or, in the alternative, a new trial, which was denied. The court entered judgment on its verdict in favor of the Wilkinsons in the total amount of $13,062.47.[4] This timely appeal followed.

We first note our scope of review on this appeal from the denial of a motion for post-trial relief. We must view the

---

3. A copy of this alleged buy-sell agreement is not included in the record, and there was no testimony at trial about it.

4. This amount includes interest.

record in the light most favorable to the verdict winner, granting the Wilkinsons the benefit of every favorable inference, and decide whether there was sufficient evidence to support the trial court's verdict. *Wenrick v. Schloemann Siemag Aktiengesellschaft*, 523 Pa. 1, 564 A.2d 1244 (1989). The factual findings of a trial judge sitting without a jury carry the same weight as a jury verdict and will not be disturbed absent an abuse of discretion or error of law. *Arcadia Co. v. Peles*, 395 Pa.Super. 203, 576 A.2d 1114 (1990). Because we find that there was insufficient evidence in the record to support the trial court's verdict, we reverse.

The evidence in this case, even when viewed in the light most favorable to the Wilkinsons, compels the conclusion that they intended to purchase an equity interest in R.W. Optics, Inc. The fact that the corporation failed, and that the investment was unsuccessful, does not change the parties' manifest intent.

Of course, it is clear from the documentary evidence and the parties' testimony that the first transfer of $3000, effected on or about December 20, 1982, was intended to be a loan. With the second transfer, which took place on or about February 16, 1983, the transaction was considered to be either a loan or a non-refundable investment for the purchase of shares, conditioned upon the parties' reaching an agreement for such purchase.

Wilkinson and Reitnauer executed a written Agreement for the Sale of Stock on or about March 14, 1983. By that time, Wilkinson had transferred $8900 to Reitnauer, and Wilkinson admitted that this money was "supposed to be purchasing stock." Moreover, Wilkinson began holding himself out to the community as vice-president of the corporation, and considered himself to be a "partner" of Reitnauer.[5]

Although Wilkinson never received physical possession of the certificates of stock he purchased, he acknowledged in a

5. This is clear from the signed Statement issued by Wilkinson on R.W.Optics letterhead. In addition, Wilkinson testified that when he went out to get business "on the marketing end, I present myself as vice president." (N.T. 7/19/91 at 51).

signed statement that he had "accepted and purchased" them. There is no evidence that the shares were intentionally withheld from Wilkinson, nor is there any evidence that he made any attempt to obtain them, other than simply asking Reitnauer for them. Wilkinson's complaint that he never gained physical possession of the stock certificates seems merely an afterthought which has been used to buttress his attempt to get his money back. Issuance of a stock certificate is not a prerequisite to the formation of a shareholder relationship. *See Krosnar v. Schmidt Krosnar McNaughton Garret Co.*, 282 Pa.Super. 526, 423 A.2d 370, 375 (1980); *Keystone Wrapping Machine Co. v. Bromeier*, 42 Pa.Super. 333 (1910). *See also In re I. D. Craig Service Corp.*, 125 B.R. 453 (W.D.Pa.1991).

Nonetheless, the trial court decided that because "R.W.Optics, Inc. was incorporated but never organized, that no stock was ever issued, no officers ever elected and no meetings ever held," and because Wilkinson never received his 436 shares of stock, the parties' "attempt to convert the loan into an equity investment in the stock of the corporation failed." *Tr. Ct. Opinion* at 2–3. However, the trial court's findings regarding the organization of the corporation, even if correct, do not change the effect of the parties' intent here. The informality with which R.W. Optics was managed is not conclusive:

> [S]hareholder status is difficult to determine in this case because of the lax method employed by [the parties] in maintaining the corporation. It is uncertain whether certificates for the original shares, by which transferral could be evidenced, were ever issued, and furthermore, a stockbook was not maintained by the corporation to record the owners of stock. The stock certificate is, however, only evidence of shareholder status and issuance is not a prerequisite to the formation of the relationship. Moreover, the corporation need not issue a certificate unless it is demanded by the shareholder, and a shareholder may transfer shares without having a certificate.

*Krosnar*, 282 Pa.Super. at 536, 423 A.2d at 375 (citations omitted).

The trial court's holding that Reitnauer "did not carry out the Agreement [for the Sale of Stock] within a reasonable period of time, that [the Wilkinsons] rescinded it and were not bound by it" is unsupported by the record. The agreement for the purchase of stock envisioned by the parties' February 16, 1982 conditional contract actually was executed; Wilkinson testified that he reached a "final agreement with respect to the purchase of the stock," and that as of the March 14, 1983 Agreement, he intended that "all of the $8900 would become investment." N.T. 7/19/91 at 36–38. In addition, Wilkinson apparently thought of himself as a "partner" and shareholder of R.W. Optics for over a year, despite the fact that he never received actual possession of stock certificates. Therefore, the trial court erred in denying Reitnauer's motion for judgment notwithstanding the verdict.

Judgment vacated and case remanded with instructions to enter judgment in favor of appellant. Jurisdiction relinquished.