THOMPSON, J.
Myra Haley appeals the equitable distribution of marital assets. Specifically, this appeal concerns equitable distribution of a joint tax refund and capital loss carry forwards (“CLCFs”) resulting from capital losses incurred by S corporations, partnerships, and trusts owned by the former spouses. We affirm in part and reverse in part.
John and Myra Haley were married in 1988, and John petitioned for dissolution in 2004. In April 2004, the parties entered into a mediated marital settlement agreement (“Agreement”) that determined the disposition of their interests in several entities created during their marriage and provided: “Any asset owned by a particular entity shall remain with that entity and any liabilities relating to an asset shall remain with the asset.” The Agreement did not affect Myra’s interest in another entity that figured prominently in the trial: the Igo Family Partnership (“Igo”), which was formed by Myra’s parents before the Haleys’ marriage. It was undisputed John had no interest in Igo and that Myra’s interest was nonmarital property.
The court entered a final judgment of dissolution that incorporated the Agreement, but reserved jurisdiction to rule on John’s motion for equal distribution of the refund and CLCFs. In June 2005, the court entered an order that found that the refund and CLCFs were intangible marital assets, subject to equitable distribution, and divided them equally. Myra timely appealed.
CPA Charles Hoyman, Jr. prepared the parties’ 2003 joint federal income tax return. He discovered that a Schedule K-l for one of the entities created during the marriage was not included in their 2002 income tax return, so he prepared an amended 2002 return to pick up its loss. The amended return increased their net operating loss for 2002, so he prepared a carry back 1040X for 1997 to carry the net operating loss from 2002 back to 1997 in accordance with Internal Service Revenue (“IRS”) regulations. Hoyman enumerated the entities, controlled by either or both parties, considered to form the CLCFs. Most of the capital loss was attributable to *1138 Igo. The tax refund at issue resulted from the carry back.
The $168,479 refund resulted from the spouses’ amended 1997 joint return. Both parties earned income in 1997, and Myra conceded they were jointly responsible for their 1997 tax payment. The parties disputed the extent of intermingling of their accounts, but both agreed that Myra wrote the checks to the IRS. Both testified that John wrote checks to Myra to cover much of the tax arising from his income. Nevertheless, Myra argued that, because she cashed John’s cheeks rather than depositing them into the account from which she paid the IRS, she was entitled to most of the refund.
The court did not abuse its discretion with respect to the tax refund, which arose from a voluntarily filed joint return for a tax year in which the parties were married. See Wolfson v. Cary, 488 So.2d 864, 870 (Fla. 3d DCA 1986). The recalculation of net operating losses for 2002 led to a refund for 1997; both were years in which the parties were married, filed jointly, and each earned income. Accordingly, the right to the joint tax refund was acquired during the marriage and should be equitably distributed. See Steinfeld v. Steinfeld, 553 So.2d 774, 776 (Fla. 4th DCA 1989). The refund resulted from taxes paid on marital income for 1997.[1] Myra conceded that she cashed checks from John for taxes and that she understood the taxes to be a joint liability. Her decision to put his cheeks in one pocket while paying the IRS from another did not transform the joint refund into nonmarital property.
In addition, the parties were entitled to $350,853 in CLCFs from their joint returns, some of which they applied to their 2003 joint return. Myra contended the asset responsible for most of the CLCFs was her nonmarital asset. CPA Thomas Behan testified on Myra’s behalf. Behan allocated the CLCFs between the parties based on the entities’ gains and losses that gave rise to the CLCFs. Behan testified that, based on analysis of the entities experiencing capital gains and losses from 2001 to 2004, Myra was entitled to $348,275 of the $350,853 CLCFs.[2]
The trial court found that the capital losses at issue occurred in 2001 and 2002, while the parties were married and filed jointly. It concluded that the resulting CLCFs were intangible marital assets that, after dissolution, the parties held as tenants in common. Accordingly, it ordered the CLCFs divided between John and Myra.
This issue is one of first impression in Florida. Courts in Indiana, Kentucky, Missouri, and New York have considered the status of CLCFs in dissolution cases, and most conclude they are marital property. See Mills v. Mills, 663 S.W.2d 369, 372 (Mo.Ct.App.1983) (ruling that the “court did not err in finding the ... [CLCF] was marital property)”; Finkelstein v. Finkelstein, 268 A.D.2d 273, 701 N.Y.S.2d 52, 54 (N.Y.App.Div.2000) (concluding “that a [CLCF] accumulated by the parties constituted a marital asset subject to distribution”); Denton v. Rose, Nos. 2003-CA-000142-MR, 2003-CA-000143-MR, 2003-CA-000545-MR, 2004 WL 2315114, at *2 (Ky.Ct.App. Oct. 15, 2004) (unpublished opinion) (holding the “tax benefit created by the stock losses [was] a *1139 marital asset,” but under the IRC, “tax loss carryovers cannot be split between former spouses once they begin filing separately and must be deducted only on the return of the spouse who actually had the loss”); see also Magee v. Garry-Magee, 833 N.E.2d 1083, 1092-93 (Ind.Ct.App. 2005) (concluding that “a tax loss carryover [was] property subject to distribution in a dissolution proceeding,” based on its observation that the parties had agreed to file jointly if doing so produced the smallest aggregate tax). But see Cerretani v. Cerretani, 221 A.D.2d 814, 634 N.Y.S.2d 228, 231 (N.Y.App.Div.1995) (holding that the plaintiff was not entitled to a credit for the CLCF because the court found, “[without determining whether [the CLCF was] marital property subject to equitable distribution, ... that this tax circumstance [was] not the type of ‘property’ addressed” by dissolution law). Though we acknowledge persuasive authority considering CLCFs to be marital assets, we hold that some of the CLCFs here were not marital assets subject to equitable distribution.
Uncontroverted evidence indicated that a substantial portion of the CLCF resulted from losses incurred by Igo, in which Myra’s interest was nonmarital property. This distinguishes the ease below from Mills, where the court had awarded one-half of a CLCF to each spouse. There, the husband argued that the CLCF was nonmarital property and that awarding half to the wife violated IRS regulations. Id. at 371. The appellate court disagreed. The CLCF resulted from the sale of stock that, though his separate property, was acquired during the marriage; therefore, the CLCF was marital property. Id. at 371-72. Here, in contrast, a substantial portion of the CLCFs resulted from capital losses incurred by Igo, in which Myra’s interest was nonmarital.
Smith v. Smith, Nos. 2004-CA-001028-MR, 2004-CA-001056-MR, —S.W.3d -, 2006 WL 140577 (Ky.App.Ct. Jan. 26, 2006) (awaiting publication), is instructive. There, the court held that the trial court did not err by equitably dividing the CLCF resulting from the husband’s failed business venture for which the wife had contributed substantial nonmarital funds. Id. at-, at *10. Here, there was no evidence that John contributed to Igo, and the trial court’s decision to grant him half the CLCFs constituted a windfall.[3]
The court correctly found that the CLCFs were not contemplated by the Agreement. The underlying capital losses were incurred during the marriage, and many may be attributed to entities created during the marriage. Nevertheless, *1140 though the parties’ entitlement to the CLCFs arose during the marriage, Igo was a nonmarital asset to which John made no special contribution, and CLCFs attributable to it should not be subject to marital distribution.
The trial court correctly distributed the refund, but abused its discretion by distributing equally the CLCFs. We remand for the court to determine the valuation and distribution of the CLCFs.[4]
AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.
GRIFFIN and ORFINGER, JJ., concur.

. In testimony, the only entity that was expressly nonmarital was Igo. Myra presented no evidence that any 1997 income derived from Igo. See § 61.075(5)(b)3.

. This figure included losses by entities owned by Myra and created during the marriage in addition to Igo’s losses.

. The court's finding that John and Myra became tenants in common, each entitled to half of the CLCFs, apparently contravenes Treasury regulation § 1.1212-1:
... If a husband and wife making separate returns for any taxable year following the first taxable year beginning after ... 1963[] made a joint return for the preceding taxable year, any ... capital loss carryovers shall be allocated to the spouse on the basis of their individual net ... capital losses for the preceding taxable year which gave rise to such capital loss carryovers, and the portions of the ... capital loss carryovers so allocated to each spouse may be carried forward by such spouse to the taxable year in accordance with paragraph (b) of this section.
See Treas. Reg. § 1.1212-1; Denton, 2004 WL 2315114 at *2; see also Rykiel v. Rykiel, 838 So.2d 508, 511 (Fla.2003) (quashing this court's decision because its construction of Internal Revenue Code provisions and a Treasury regulation was inconsistent with the provisions in question); Wayne P. Kerr, Tax Carryovers: Important Assets to Consider in High Income or High Asset Divorce Cases or Valuation Nightmare, 17 J. Am. Acad. Matrimonial Law. 361, 362-63 (discussing CLCFs, Finkelstein, and Mills).

. CLCF valuation can be complicated; in contrast to a tax refund, which is fixed and retrospective in nature, CLCFs are indefinite, prospective, and may require analysis of present value. See Kerr, 17 J. Am. Acad. Matrimonial Law. at 362. Here, however, valuation may prove simpler in light of the capital gains resulting from the 2004 sale of the parties' Wyoming home, for which each party received approximately $3 million.