## Capozzi v. Latsha & Capozzi P.C.

C.P. of Cumberland County, nos. 99 -3981, 99-3542, 97-5584.

*John McNaight Cramer,* for plaintiff.
*Richard H. Wix,* for defendants

BAYLEY, *J.,* February 27, 2001—Louis J. Capozzi Jr., is a shareholder in the law firm of Latsha & Capozzi P.C. His employment as an attorney with the firm ended on June 6, 1997. He instituted suit against the professional corporation and its other shareholders, Kimber L. Latsha, Glenn R. Davis and Douglas C. Yohe, to recover the actual value of his stock in Latsha & Capozzi P.C. as of June 6, 1997. He further sought to recover principal and interest on a demand promissory note that defendants gave to him. Defendants countered with a claim against Capozzi for his proportional share of legal fees the law firm returned to Capozzi's clients that defendants maintained were overbilled by him, plus the firm's costs to identify and determine the amount of the overbillings. On Capozzi's claim for the actual value of his stock in Latsha & Capozzi P.C., as of June 6, 1997, defendants maintained that all of the shareholders had an oral agreement that if any shareholder left his employment with the firm, and then competed with the firm,

that shareholder would receive for his stock the amount of his capital contribution, not the actual value on the date of termination. The capital contribution of each shareholder in the firm was $5,000.[1]

The parties agreed to a bifurcation of the liability and damage phases of the trial, with a jury determining any liability and the trial judge determining any damages. On November 1, 2000, a jury returned a verdict on liability answering "Yes" to the following three questions:

"Question 1:

"Are Latsha & Capozzi P.C., Kimber L. Latsha, Glenn R. Davis and Douglas C. Yohe liable to Louis J. Capozzi Jr., for payment of the demand note the law firm gave to Capozzi?

"Question 2:

"Is Louis J. Capozzi Jr. liable to Latsha & Capozzi P.C., Kimber L. Latsha, Glenn R. Davis and Douglas C. Yohe, as a shareholder for his proportional share of the money the law firm returned to clients who were over-billed by him, and for the cost of identifying the clients and determining the amounts of the overbillings?

"Question 3:

"Did the shareholders of Latsha & Capozzi P.C., have an oral agreement with Louis J. Capozzi Jr., that if a shareholder left the law firm, and competed with the firm, that shareholder's stock would be valued at his capital contribution?"

_____

1. Multiple lawsuits were filed at the three captions to this opinion in which these claims were interdisbursed.

On December 18, 2000, this trial judge, after taking additional evidence on damages, entered the following verdict:

"(1) Louis J. Capozzi Jr. is awarded principal in the amount of $38,071.50 plus interest totaling $8,668.48 through December 18, 2000, for a total of $46,683.98, against Latsha & Capozzi P.C., Kimber L. Latsha, Glenn R. Davis and Douglas C. Yohe, on the demand note as found by the jury in question number 1.[2]

"(2) Latsha and Capozzi P.C., Kimber L. Latsha, Glenn R. Davis and Douglas C. Yohe are awarded damages, and as a setoff, from Louis J. Capozzi Jr., of $14,140.78 for client refunds representing his proportional share of the money the law firm returned to clients who were overbilled by him, and auditing expenses of $5,679.02 representing the total cost of identifying the clients and determining the amounts of the overbillings, for a total of $19,819.80 as found by the jury in question number 2.

"(3) Louis J. Capozzi Jr., is awarded $5,000 against Latsha and Capozzi P.C., Kimber L. Latsha, Glenn R. Davis and Douglas C. Yohe, with legal interest from June 6, 1997, for the value of his stock at his capital contribution as found by the jury in question number 3."

Plaintiff and defendants filed motions for post-trial relief which were briefed and argued on February 7, 2001. Plaintiff claims that he is entitled to judgment

___

2. The figures used in the verdict are as set forth in plaintiff's exhibit number 1 at the hearing on damages. Two are incorrect. The principal amount of the note as shown on plaintiff's exhibit number 2, in the jury trial, was $38,017.50. When this figure is added to the interest of $8,668.48, it totals $46,685.98.

n.o.v. on liability for the actual value of his stock in Latsha & Capozzi P.C., as of June 6, 1997, "because an agreement forfeiting an attorney's right to compensation in the event he competes with his former law firm is unenforceable." On this issue, defendants were the verdict winners. The evidence in a light most favorable to defendants is as follows.[3]

In 1994, Louis Capozzi and Kimber Latsha worked as attorneys for the Cumberland County law firm of Shumaker & Williams. They left Shumaker & Williams, and on May 23, 1994, incorporated Latsha & Capozzi, a professional corporation for the practice of law. Capozzi and Latsha took a number of Shumaker & Williams' clients with them. In July 1994, Douglas Yohe left Shumaker & Williams to become a shareholder in Latsha & Capozzi. He brought some of Shumaker & Williams' clients with him. In 1994, Latsha & Capozzi P.C., had gross revenues of approximately $300,000. In March 1995, Glenn Davis left Shumaker & Williams to become a shareholder in Latsha & Capozzi. He also brought some of Shumaker & Williams' clients with him. Once Davis became a shareholder, Latsha and Capozzi each owned 37 1/2 percent of the stock in Latsha & Capozzi P.C., with Yohe owning 15 percent and Davis owning 10 percent. By the end of 1996, Latsha & Capozzi P.C. had 15 attorneys and gross revenue for the year of $2.6 million.

In January 1997, Latsha, Yohe, and Davis became concerned about the conduct of Capozzi, which they felt was injurious to the reputation of the law firm. They

_____

3. *Wilkinson v. Reitnauer,* 421 Pa. Super. 345, 617 A.2d 1326 (1992).

attributed Capozzi's conduct to the abuse of alcohol. On May 2, 1997, the three shareholders of the firm and others conducted an intervention in an effort to have Capozzi enter the Caron Foundation for treatment. On the same date, the board of directors reduced Capozzi's $175,000 annual salary to $100,000 a year.[4] On May 5, Capozzi undertook inpatient treatment at the Caron Foundation. He completed that treatment on May 19. On June 2, the board of directors suspended Capozzi's employment without pay. On June 6, Capozzi was notified in writing that he could return to employment with the firm for an open probationary period subject to 13 conditions. Capozzi did not accept the conditions and his employment with the firm terminated. On June 11, Capozzi started his own law firm, Capozzi Associates, in Harrisburg, Dauphin County.

Capozzi's legal specialty is representing medical care providers, who seek higher reimbursements than have been paid by government and other entities to the providers for services rendered to patients. Latsha & Capozzi P.C. billed clients based on written fee agreements of hourly rates for the shareholders and associates in the firm. In 1996, having become more adept at representing the firm's medical providers, Capozzi sought to switch to value billing. The board of directors rejected the proposal. Notwithstanding, Capozzi arbitrarily increased the time billed to 66 clients from the

---

4. Each attorney drew an annual salary. At the end of each year, any money that was left over after the payment of expenses was distributed to the shareholders, one-half of it in proportion to their ownership interest in the firm, and the other half in proportion to the amount of each shareholder's individual billings during that year.

actual time that associates had worked on behalf of those clients. The law firm discovered these overbillings, which were in violation of the firm's written fee agreement with those clients, shortly before Capozzi's employment ended on June 6, 1997. The firm had an audit conducted and determined that the 66 clients had been overbilled by Capozzi. In July and August, 1997, Latsha & Capozzi P.C., returned to each of the 66 clients the amount of money that Capozzi had overbilled that client. When the money was returned, the firm informed each client that it had determined that there was an overbilling, but it did not advise the clients of the reason why.

In May 1997, Capozzi generated a complete client list from the firm's computer base. When he started Capozzi Associates on June 11, 1997, he took many of the clients of Latsha & Capozzi P.C., with him, some of which were among the 66 clients the firm returned money to because of his overbillings. Capozzi solicited some of these clients before his employment ended on June 6, 1997, and sent them release forms. Capozzi Associates now has nine attorneys.

When Latsha and Capozzi incorporated their law firm, they had an oral agreement that if either of them left the firm, and competed with the firm, that shareholder would receive for his stock the amount of his capital contribution in the professional corporation. When Yohe became a shareholder, he entered into a similar oral agreement with Latsha and Capozzi. When Davis became a shareholder, he too entered into a similar oral agreement with Latsha, Capozzi, and Yohe. Latsha & Capozzi P.C. never had a written shareholders' agreement. The

shareholders at times talked about entering into a written agreement, and numerous drafts were circulated, but they were never acted upon.[5]

Plaintiff maintains that the oral agreement that the jury found existed between the shareholders of Latsha & Capozzi P.C., that if a shareholder left the law firm, and competed with the firm, that shareholder's stock would be valued at his capital contribution, restricts his right as a lawyer to practice law after his termination as an employee of Latsha & Capozzi P.C., and therefore is unenforceable as a violation of public policy. In support of that argument, plaintiff cites Rule 5.6 of the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania. The rules are derived from, although not in their entirety, the Model Rules of Professional Conduct adopted by the American Bar Association. Rule 5.6 provides:

"A lawyer shall not participate in offering or making:

"(a) *a* partnership, *shareholders,* operating, employment or other similar type of *agreement that restricts the rights of a lawyer to practice after termination of the relationship,* except an agreement concerning benefits upon retirement . . . ." (emphasis added)

The comment to the rule provides:[6]

"An agreement restricting the right of partners or associates to practice after leaving a firm not only limits

---

5. Louis Capozzi testified that there were never any oral agreements among the shareholders to govern dissolution.

6. A note on the scope of the Rules of Professional Conduct states that "The comment accompanying each rule explains and illustrates the meaning and purpose of the rule." When it accepted the rules, the Supreme Court stated, "Any comments or comparisons to the Code of

their professional autonomy but also limits the freedom of clients to choose a lawyer. Paragraph (a) prohibits such agreement except for restrictions incident to provisions concerning retirement benefits for service with the firm."

Besides denying that the oral agreement between the shareholders restricted plaintiff's right to practice law, defendants maintain that plaintiff derives no substantive rights from Rule 5.6 even if the rule was violated. The note on the scope of the rules states:

"Failure to comply with an obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process. . . .

*"Violation of a rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached.* The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. *They are not designed to be a basis for civil liability.* Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. *The fact that a rule is a just basis* for a lawyer's self-assessment, or *for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule.* Accordingly, *nothing in the rules should be deemed to augment any substantive*

---

Professional Responsibility shall not be part of the Rules of Professional Conduct."

*legal duty of lawyers* or the extra-disciplinary consequences of violating such a duty." (emphasis added)[7]

Notwithstanding, plaintiff cites *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 602 A.2d 1277 (1992). In *Maritrans,* the plaintiff brought an action for preliminary and permanent injunctive relief, and damages, against a law firm that had represented him for more than 10 years. The case arose out of the law firm's representation of plaintiff's competitors, entities whose interest were found to be adverse to the interest of plaintiff, in matters substantially related to matters in which the firm had represented plaintiff. The Supreme Court of Pennsylvania reversed an order of the Superior Court of Pennsylvania that had reversed a preliminary injunction issued by a trial court. The court stated:

"While we agree that violations of the Code [of Professional Responsibility] do not per se give rise to legal actions that may be brought by clients or other private parties, we, nevertheless, conclude that the record supports a finding that appellees' conduct here constituted a breach of common-law fiduciary duty owed to appellant-clients and that, contrary to appellees' argument that they cannot be prevented from representing a former client's competitors, the injunction issued by

---

7. The Associations Code of Pennsylvania at 15 Pa.C.S. §2925(e), provides:

*"Disciplinary jurisdiction unaffected.*—A professional corporation shall be subject to the applicable rules and regulations adopted by, and all the disciplinary powers of, the court, department, board, commission or other government unit regulating the profession in which the corporation is engaged."

the trial court against appellees should have been sustained by the Superior Court. . . .

"Long before the Code of Professional Responsibility was adopted, and before the Rules of Professional Conduct were adopted, the common law recognized that a lawyer could not undertake a representation adverse to a former client in a matter 'substantially related' to that in which the lawyer previously had served [a] client. . . .

"The Superior Court seems to have the idea that because conduct is not a tort simply because it is a disciplinary violation, then conduct ceases to be a tort when it is at the same time [of] a disciplinary violation. This is an [invasion] of logic and legal policy and misunderstands the history of the disciplinary rules." *Id.* at 245, 256, 257, 602 A.2d at 1279, 1284, 1285.

Citing *Bilec v. Auburn & Associates Inc., Pension Trust,* 403 Pa. Super. 176, 588 A.2d 538 (1991), plaintiff maintains that the oral agreement found by the jury that prevalued a shareholder's stock at the capital contribution of $5,000 in the event the shareholder left the firm, and competed with the firm, violates the common-law policy against forfeitures. The issue in *Bilec,* was whether a noncompete clause in an insurance pension plan contract, which provided for a forfeiture of vested pension benefits of an employee who undertook subsequent employment that competed with an employer, was contrary to public policy of the Commonwealth, and therefore unenforceable. The Superior Court noted:

"While we are not in agreement with the appellants' blanket contention that all pre-ERISA forfeiture clauses are violative of the public policy of this Commonwealth,

we do find that this particular forfeiture clause violates public policy of Pennsylvania in regards to the enforcement of covenants not to compete." *Id.* at 182, 588 A.2d at 540.

The Superior Court stated:

"The standard by which the validity of a restrictive covenant in an employment cont[r]act is judged in Pennsylvania is set forth in *Piercing Pagoda Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207 (1976). These three requirements are: (1) the covenant must relate to a contract for employment; (2) the covenant must be supported by adequate consideration; (3) the application of the covenant must be reasonably limited in both time and territory." *Id.* at 183, 588 A.2d at 541.

In *Bilec,* the court concluded that the forfeiture of an employee's vested pension benefit upon the employee's leaving employment and competing with the employer, was unenforceable because (1) it was not part of a contract between the employer and employee; rather it was part of the employer's contract with the employer's insurer, (2) the record did not reflect that the employer granted its employees any additional consideration in exchange for the imposition of the forfeiture clause, and (3) the forfeiture clause did not include any time or geographical restrictions, rather it was a blanket prohibition against any former employee from working in any capacity for any company deemed by the employer to be a competitor.

In *Cohen v. Lord, Day & Lord,* 550 N.E.2d 410 (New York 1989), the law firm of Lord, Day & Lord had a written partnership agreement providing that a partner leaving the firm would receive a departure payment over

a three-year period. Appellant Cohen withdrew from the firm. He then practiced law in competition with the firm. The firm refused to pay Cohen any departure compensation pursuant to the following clause in the partnership agreement:

"Notwithstanding anything in this article to the contrary, if a partner withdraws from the partnership and without the prior written consent of the executive committee continues to practice law in any state or other jurisdiction in which the partnership maintains an office or any contiguous jurisdiction, either as a lawyer in private practice or as a counsel employed by a business firm, he shall have no further interest in and there shall be paid to him no proportion of the net profits of the partnership collected thereafter, whether for services rendered before or after his withdrawal. There shall be paid to him only his withdrawable credit balance on the books of the partnership at the date of his withdrawal, together with the amount of his capital account, and the partnership shall have no further obligation to him."

Cohen sued the firm seeking departure compensation. New York's Disciplinary Rule 2-108(A) is substantially the same as Rule 5.6 of the Pennsylvania Rules of Professional Conduct. Relying on the rule, the Court of Appeals of New York held: "[w]hile the provision in question does not expressly or completely prohibit a withdrawing partner from engaging in the practice of law, the significant monetary penalty it exacts, if the withdrawing partner practices competitively with the former firm, constitutes an impermissible restriction on the practice of law. The forfeiture-for-competition provision would functionally and realistically discour-

age and foreclose a withdrawing partner from serving clients who might wish to continue to be represented by the withdrawing lawyer and would thus interfere with the client's choice of counsel."

The court rejected the firm's policy argument that the forfeiture of departure compensation was justified because of the economic hardship suffered by a firm when a partner leaves and competes with the firm, stating:

"While a law firm has a legitimate interest in its own survival and economic well-being and in maintaining its clients, it cannot protect those interests by contracting for the forfeiture of earned revenues during the withdrawing partner's active tenure and participation and by, in effect, restricting the choices of the clients to retain and continue the withdrawing member as counsel." (citations omitted)

In contrast, the Supreme Court of California stated in *Howard v. Babcock,* 863 P.2d 150 (California 1994):

"We granted review to decide whether an agreement between law partners is enforceable if it requires the withdrawing partners to forego certain contractual withdrawal benefits if they compete with their former law firm. We conclude that an agreement among law partners imposing a reasonable toll on departing partners who compete with the firm is enforceable."

The partners of Parker, Stanbury, McGee, Babcock & Combs entered into a partnership agreement which contained the following:

"Article X of the agreement provided in pertinent part that: 'Should more than one partner, associate or individual withdraw from the firm prior to age 65 and there-

after within a period of one year practice law . . . together or in combination with others, including former partners or associates of this firm, in a practice engaged in the handling of liability insurance defense work as aforesaid within the Los Angeles or Orange County court system, said partner or partners shall be subject, at the sole discretion of the remaining non-withdrawing partners to forfeiture of all their rights to withdrawal benefits other than capital as provided for in article V herein.'

"FN1. Article X also provided that if only one partner withdraws, he or she is subject to forfeiture of 75 percent of withdrawal benefits for competition in Orange County or Los Angeles County, and 25 percent of withdrawal benefits if her [sic] or she competes in specified other counties.

"Article V provided that a general partner who withdraws from the partnership shall be paid his or her capital interest, and a sum 'equal to the share in the net profit of the firm that the withdrawn . . . partner would have received during the first 12 month period.' "

Plaintiffs left the firm and took about 200 cases with them. Defendants tendered payment to plaintiffs for their share of the capital of the firm, but refused to compensate them for the accounts receivable or to acknowledge that they had any interest in the work in progress or unfinished business of the firm. A Rule of Professional Conduct in California is substantially the same as Rule 5.6 of the Pennsylvania Rules of Professional Conduct. The Supreme Court of California concluded:

"We are not persuaded that this rule was intended to or should prohibit the type of agreement that is at issue

here. An agreement that assesses a reasonable cost against a partner who chooses to compete with his or her former partners does not restrict the practice of law. Rather, it attaches an economic consequence to a departing partner's unrestricted choice to pursue a particular kind of practice. . . .

"[o]ur interpretation of the rule must be illuminated by our recognition that a revolution in the practice of law has occurred requiring economic interests of the law firm to be protected as they are in other business enterprises. We are confident that our recognition of a new reality in the practice of law will have no deleterious effect on the current ability of clients to retain loyal, competent counsel of their choice.

" 'The traditional view of the law firm as a stable institution with an assured future is now challenged by an awareness that even the largest and most prestigious firms are fragile economic units. . . .' (Hillman, Law Firm Breakups (1990) §1.1, at p. 1.) Not the least of the changes rocking the legal profession is the propensity to withdrawing partners in law firms to 'grab' clients from the firm and set up a competing practice. (Penasack, Abandoning the Per Se Rule Against Law Firm Agreements Anticipating Competition: Comment on *Haight, Brown & Bonesteel v. Superior Court of Los Angeles County* (1992) 5 Geo. J. Legal Ethics 889, 890 [hereafter Abandoning the Per Se Rule]; see also, Terry, Ethical Pitfalls and Malpractice Consequences of Law Firm Breakups (1988) 61 Temple L.Rev. 1055, 1056-1060 [hereafter Ethical Pitfalls].) In response, many firms have inserted noncompetition clauses into their partnership agreements. (Abandoning the Per Se

Rule, *supra,* 5 Geo. J. Legal Ethics at p. 890.) These noncompetition clauses have grown and flourished, despite, or in defiance of the consistent holding of many courts across the nation that a noncompetition clause violates the rules of professional conduct of the legal profession. It is evident that these agreements address important business interests of law firms that can no longer be ignored.

"The firm has a financial interest in the continued patronage of its clientele. (See Kalish, Covenants Not to Compete and the Legal Profession (1985) 29 St. Louis U.L.J. 423, 438.) The firm's capital finances the development of a clientele and the support services and training necessary to satisfactorily represent the clientele. *(Id.)* In earlier times, this investment was fairly secure, because the continued loyalty of partners and associates to the firm was assumed. (Abandoning the Per Se Rule, *supra,* 5 Geo. J. Legal Ethics, at p. 889; Ethical Pitfalls, *supra,* 61 Temple L.Rev. at p. 1059.) But more recently, lateral hiring of associates and partners, and the secession of partners from their firms has undermined this assumption. (Abandoning the Per Se Rule, supra, 5 Geo. J. Legal Ethics, *supra,* at p. 890.) Withdrawing partners are able to announce their departure to clients of the firm, and many clients defect along with the attorneys with whom they have developed good working relationship. The practical fact is that when partners with a lucrative practice leave a law firm along with their clients, their departure from and competition with the firm can place a tremendous financial strain on the firm. (See Kalish, Covenants Not to Compete, *supra,* 29 St. Louis U.L.J. at p. 438.). . . .

"We are aware that many courts have interpreted the rules of professional conduct of their states, often stated in identical or very similar terms with the language of our rule 1-500, as prohibiting all agreements restricting competition among lawyers, including those that merely assess a cost for competition. (citing cases)

"However, we disagree with the analysis proffered by these courts to justify such an interpretation. Some courts, including the court of appeal in this case, reason that an attorney should have freedom to choose when, where and for whom to practice law; an anticompetitive covenant restricts that freedom. (See *e.g., Cohen v. Lord, Day & Lord, supra,* 551 N.Y.S.2d at p. 158, 550 N.E.2d at p. 411.) Second, many courts reiterate that the practice of law is not a business, and clients are not commodities. These courts assert as an absolute rule that clients must have free choice of attorneys; to the extent that a restriction or toll on competition between lawyers is effective, it limits the ability of clients to have access to the attorney of their choice and is therefore improper. (See *e.g., Jacob v. Norris, McLaughlin & Marcus, supra,* 607 A.2d at p. 147.)

"Upon reflection, we have determined that these courts' steadfast concern to assure the theoretical freedom of each lawyer to choose whom to represent and what kind of work to undertake, and the theoretical freedom of any client to select his or her attorney of choice is inconsistent with the reality that both freedoms are actually circumscribed. Putting aside lofty assertions about the uniqueness of the legal profession, the reality is that the attorney, like any other professional, has no

right to enter into employment or partnership in any particular firm, and sometimes may be discharged or forced out by his or her partners even if the client wishes otherwise. Nor does the attorney have the duty to take any client who proffers employment, and there are many grounds justifying an attorney's decision to terminate the attorney-client relationship over the client's objection. (See R.P.C. 3-700; 1 Witkin Cal. Procedure, *supra,* Attorneys, §§73-80, pp. 94-100.) Further, an attorney may be required to decline a potential client's offer of employment despite the client's desire to employ the attorney. For example, the attorney may have a technical conflict of interest because another attorney in the firm previously represented an adverse party. (R.P.C. 3-300, 3-310.) Finally, the client in the civil context, of course, ordinarily has no 'right' to any attorney's services, and only receives those services he or she can afford.

"Moreover, the contemporary changes in the legal profession to which we have already alluded make the assertion that the practice of law is not comparable to a business unpersuasive and unreflective of reality. Commercial concerns are now openly recognized as important in the practice of law. Indeed, we question whether any but the wealthy could enter the profession if it were to be practiced without attention to commercial success. In any event, no longer can it be said that law is a profession apart, untouched by the marketplace. Not only has law firm culture changed but, as in other businesses, lawyers now may advertise their services and may even communicate by letter with persons unknown to them, suggesting the possibility of employment.

(*Shapero v. Kentucky Bar Assn.,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed. 2d 475 (1988); *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed. 2d 810 (1977).) Thus the general rules and habits of commerce have permeated the legal profession. . . .

"Further, we question the premise that an agreement such as is at issue here would necessarily discourage withdrawing partners from continuing to represent clients who choose to employ them. Unless the penalty were unreasonable, it is more likely that the agreement would operate in the nature of a tax on taking the former firm's clients—a tax that is not unreasonable, considering the financial burden the partners' competitive departure may impose on the former firm. The sum to be forfeited by the withdrawing partners may be seen as comparable with a liquidated damage clause, an accepted fixture in other commercial contexts. . . ."

In *Howard,* the Supreme Court of California reversed an order of an intermediate appellate court that had ruled in favor of the remaining partners in the law firm, and remanded the case to the trial court for a determination of whether the terms of article X were reasonable, and for any further award on the accounting causes of action made necessary by its determination.

We have quoted extensively from *Howard* because we agree with the reasoning of the Supreme Court of California. We disagree with the reasoning of the Court of Appeals of New York in *Cohen v. Lord, Day & Lord, supra.* In *Cohen,* the court of appeals relied on a disciplinary rule in holding that the departing attorney was entitled to departure compensation. In the present case, it does not appear that plaintiff can rely on Rule 5.6 of

the Pennsylvania Rules of Professional Conduct for substantive relief. *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, supra.* Notwithstanding, we conclude as a matter of public policy that in Pennsylvania, attorneys who are shareholders of a professional corporation may enter into an enforceable agreement that reasonably prevalues the stock of a departing shareholder who then competes with the law firm. This is a form of a restrictive noncompete covenant. Therefore, to be enforceable such an agreement must meet the standards set forth by the Supreme Court of Pennsylvania in *Piercing Pagoda Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207 (1976), which are, (1) the agreement must relate to a contract for employment, (2) it must be supported by adequate consideration, and (3) the application of the agreement must be reasonably limited in both time and territory.

In the case sub judice, the oral agreement of all of the shareholders of Latsha & Capozzi P.C., upon each of them undertaking employment as an attorney with the professional corporation, was that if any shareholder left the firm, and competed with the firm, that shareholder would receive for his stock the amount of his capital contribution. Implicit in the agreement was that if a shareholder left the firm he would be paid for his stock. While the first two prongs of *Piercing Pagoda* have been met, the third is not. The application of the oral agreement of each shareholder not only was not reasonably limited in both time and territory, it was not limited at all. Accordingly, the oral agreement between the shareholders is unenforceable to the extent that it

limits plaintiff to receiving $5,000 for the value of his stock in Latsha & Capozzi P.C.

Notwithstanding, defendants maintain that even if the oral agreement limiting the value of plaintiff's stock at $5,000 is unenforceable, plaintiff still is not entitled to a judgment n.o.v. on liability for the actual value of his stock because (1) he is not precluded from continuing to own his stock in Latsha & Capozzi P.C., and (2) the corporation is not required to repurchase his shares under the provisions in the Associations Code, 15 Pa.C.S. §101 et seq., that are applicable to professional corporations. 15 Pa.C.S. §§2901-2925. To be entitled to a judgment notwithstanding the verdict, plaintiff must be entitled to a judgment as a matter of law even with all factual inferences decided adverse to him. *Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003 (1992). Defendants argue that the Association Code affords only two statutory remedies analogous to the relief sought by plaintiff: first, the reacquisition and valuation of shares of a disqualified shareholder (defined at 15 Pa.C.S. §2902), and second, the valuation of shares of a deceased shareholder (15 Pa.C.S. §2907(a)). Defendants maintain that plaintiff is not disqualified as the word is defined, nor is he deceased; therefore, he simply continues to own his stock in the professional corporation. See *Berrett v. Purser & Edwards,* 876 P.2d 367 (Utah 1994). Given the facts of the present case, we need not analyze whether defendants' interpretation of these statutory provisions is correct. Implicit in the oral agreement of all of the shareholders of Latsha & Capozzi P.C., was that if a shareholder left the law firm, he would be paid for his stock. The issue is what that shareholder would

be paid, not whether he would be paid. The jury found that there was an oral agreement. It is that part of the oral agreement that would limit the value of the stock to $5,000, that is unenforceable.

Defendants further maintain that even if the oral agreement limiting the value of plaintiff's stock at $5,000 is unenforceable, the remedy should be a new trial on the issue of liability, and not a judgment n.o.v. Defendants maintain that the value of plaintiff's stock would be less than the actual value if a jury determined that his employment with Latsha & Capozzi P.C. terminated because of his wrongful conduct. Stated another way, defendants maintain that they imposed reasonable conditions upon plaintiff for his continued employment at Latsha & Capozzi P.C. and that the jury should have been allowed to consider whether, under those circumstances, plaintiff's termination of employment was voluntary.[8] The shareholders of Latsha & Capozzi P.C. never had an agreement that wrongful conduct by a shareholder would result in a reduction in the value of his stock. The agreement the shareholders had was that if an attorney left the law firm and competed with the firm, that shareholder would receive for his stock the amount of his capital contribution in the professional corporation. That provision is unenforceable. Plaintiff's conduct is not determinative as to the value of his stock.[9]

---

8. At trial, defendants sought a charge to this effect which was rejected.

9. Defendants are recovering $19,819.80 from plaintiff based on his proportional share of client refunds, and the total auditing expenses of identifying the clients and determining the amount of the overbillings that resulted in the refunds, based on plaintiff's wrongful conduct.

Therefore, defendants are not entitled to a new trial on liability, and plaintiff is entitled to a judgment n.o.v. on liability. This will, however, require a new trial on the issue of plaintiff's damages.[10]

In the interest of judicial economy we will address plaintiff's alternative post-trial motion for a new trial. Plaintiff maintains that a draft of a proposed shareholder agreement that was never executed by the shareholders warranted submitting to the jury a question of whether the $5,000 limitation on the value of the departing shareholder's stock applied only to a shareholder who voluntarily terminated his employment with Latsha & Capozzi P.C. The unexecuted draft set forth that, "in the event a shareholder terminates his employment with the corporation and continues in the private practice of law in jurisdictions where the corporation has attorneys licensed to practice, the price for the selling shareholder's stock shall be his capital contribution." Latsha, Davis and Yohe each testified that this proposal essentially corresponded to their oral agreement that if any of them left the firm, and competed with the firm, that shareholder would receive for his stock the amount of his capital contribution in the professional corporation. Plaintiff denied that there was any agreement to prevalue stock. No shareholder testified that the prevaluation of a departing shareholder's stock at $5,000 was dependent on whether a shareholder voluntarily left the firm.

------

10. Plaintiff alleges that the value of his stock at the time his employment terminated with Latsha & Capozzi P.C., constituting the firm's cash, accounts receivable, unbilled time and tangible assets, net of associated liabilities, is approximately $411,000.

The unexecuted draft cannot change the actual agreement of the shareholders.

## POST-TRIAL MOTION OF DEFENDANTS

Defendants filed a motion for post-trial relief claiming the court erred in failing to award them damages for their individual hourly rate as lawyers for the time each of them spent working on the overbilling issue, and for the fee they incurred from an attorney, who specialized in legal ethics, who they hired to advise them on the issues involving plaintiff. Defendants have cited no authority in support of their position. Their position is no different than a plumber wanting to charge his hourly rate for the time taken to resolve an issue involving a dishonest employee, and to recover attorney fees incurred in such a matter. There is no statutory, contractual or other basis to support defendants' claim. In *Merlino v. Delaware County,* 556 Pa. 422, 425, 728 A.2d 949, 951 (1999), the Supreme Court of Pennsylvania stated that, "This court has consistently followed the general, American rule that there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception."

Defendants further maintain that the court erred in charging the jury that the individual defendants, in addition to Latsha & Capozzi P.C., could be held liable on the demand promissory note given to plaintiff. Defendants objected to the charge, claiming that the note dated December 31, 1996, bound only the corporation to pay plaintiff $38,017.50 with interest at a rate of 5.75 percent. Defendants again raised this issue in their post-

trial motion. They are correct. The note requires "Latsha & Capozzi P.C." to pay on demand the $38,017.50 with interest. It is signed by Kimber L. Latsha, as president of Latsha & Capozzi P.C., and attested to by Douglas C. Yohe, the secretary of the corporation. We will grant defendants' relief by limiting plaintiff to a recovery on the note against Latsha & Capozzi P.C., and not the individual defendants.

Lastly, defendants maintain that we should mold the verdict by awarding legal interest on the verdict against plaintiff for $19,819.80 for his proportional share of the money the law firm returned to clients who were overbilled by him, and the auditing expenses of $5,679.02 representing the total cost of identifying the clients and determining the amounts of the overbillings. We agree and will mold the verdict to award legal interest from August 1, 1997, which represents the middle of the period in which the refunds were paid to the clients.

For the foregoing reasons, the following order is entered.

## ORDER

And now, February 27, 2001, it is ordered:

(1) The motion of plaintiff for a judgment n.o.v. the verdict on liability as to the value of his stock in Latsha & Capozzi P.C., is granted. Plaintiff is awarded a new trial on damages.

(2) The motion of the defendants, Kimber L. Latsha, Glenn R. Davis and Douglas C. Yohe, for a judgment notwithstanding the verdict on their individual liability on a demand promissory note, is granted.

(3) The verdict in favor of defendants against plaintiff in the amount of $19,819.80, is molded to add legal interest at the rate of 6 percent per annum from August 1, 1997.